Filed 8/28/13  P. v. Scherer CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, <br><br>     Plaintiff and Respondent, <br><br> v. <br><br> ERNEST FRANCES SCHERER, <br><br>     Defendant and Appellant. | A132585 <br><br> (Alameda County <br> Super. Ct. No. C161707) |

The parents of 29-year-old Ernest Frances Scherer III (defendant) were found murdered in their home, bludgeoned and stabbed, their throats slit.  After a 55-day jury trial in which more than 90 witnesses testified, defendant was convicted of two special circumstance murders with personal use of a sharp instrument:  murder for financial gain and multiple murders.  (Pen. Code, §§ 187, 190.2, subd. (a)(1) & (a)(3).)  He was sentenced to two life terms without possibility of parole.

Defendant appeals, and raises issues related to jury voir dire, admissibility of character evidence, multiple instances of claimed prosecutorial misconduct, and ineffective assistance of counsel for failing to object to experimental evidence.  He further claims the abstract of judgment must be modified to strike a $10,000 parole revocation fine (Pen. Code, § 1202.45) because he was sentenced to two life terms without possibility of parole.  We find no reversible error but order the abstract of judgment amended to strike the parole revocation fine.

# FACTUAL BACKGROUND

## The prosecution's case

Ernest Scherer, Jr. (Scherer),[1] and his wife, Charlene Abendroth (Abendroth) had two children, defendant and his younger sister Catherine Scherer Gray (Catherine).[2] Scherer and Abendroth had separate wills under which, if neither predeceased the other, Scherer's sister Carolyn Oesterle would be executor of both estates, which were to be divided between defendant and Catherine but held in trust until each beneficiary reached the age of 30. Defendant would turn 30 on July 3, 2008. This, the prosecution would contend, provided the motive for murder.

On March 14, 2008, the bodies of Scherer and Abendroth were found in their home in the Castlewood Country Club (Castlewood) in Pleasanton. There was a strong odor of decay when authorities first entered the house. Based on the decomposition of the bodies, it was estimated they had been dead for four to 12 days before the autopsy, which occurred on March 17, 2008. They had been bludgeoned, stabbed in their heads, arms, and upper bodies, and their throats and wrists had been slit. Scherer had six blunt force injuries and six incisive wounds. Abendroth suffered similar, but even more extensive injuries. The forensic pathologist could not tell which of the couple had been attacked first.

Bloody footprints were found near the bodies and throughout the house. It was later determined they had been made by Nike Impax Tomahawk shoes, size 12.[3] A trail of blood led to the family room where a bloody warranty card for a Nike baseball bat was

---

[1] Because four generations of Scherers share a common name, we will refer to the grandfather, Ernest Scherer, Sr., as "Senior," to the father, Ernest Scherer, Jr., as "Scherer," to the defendant, Ernest Scherer III as "defendant," and to defendant's son, Ernest Scherer IV, as "Ernest IV."

[2] Catherine Scherer Gray and defendant's former wife, Robyn Scherer, will be referred to by their first names. No disrespect is intended. Catherine's husband, Joseph Gray, will be referred to as "Gray."

[3] Defendant's shoes seized from his Brea home ranged in size from 9-1/2 to 11. When he was arrested he was wearing size 9-1/2 Nike shoes.

found. A Nike representative testified it could have been attached to any one of four models, including the Ripken youth baseball bat.

Local newspapers dated from March 9 through 12 had collected in the victims' yard, as had Wall Street Journals dated March 8 through 12. It was stipulated that clocks were due to be set forward for Daylight Savings Time at 2:00 a.m. on March 9. When the sheriff's deputies entered the house on March 14, the clocks had not been set forward. Scherer had left a phone message for his daughter on March 7 at 7:00 p.m., which was the last she heard from her parents, though she tried to contact them daily over the ensuing week. The couple had last been seen having dinner at the club's restaurant on March 7; they had left the restaurant before 8:00 p.m. Scherer had a phone conversation with a former congressman on March 7 at 8:30 p.m. Scherer was scheduled to walk his precinct at 8:00 a.m. on March 8 for a voter registration drive, but he never showed up. Based on the foregoing, law enforcement operated on the theory that Scherer and Abendroth were killed on the night of March 7, sometime after 8:30 p.m., or in the early morning hours of March 8.

The front door of the Castlewood home was unlocked and there was no sign of forced entry. The house had been ransacked upstairs, but not downstairs. Scherer's wallet, which contained approximately $700, was in a pants pocket in the bedroom, along with $9,000 in cash in another pocket. His wedding ring was lying on the kitchen floor near his body. Abendroth was wearing some of her jewelry and the rest was in the master bedroom. Her purse was on the kitchen table. The sheriff's deputies found Scherer's will in a desk drawer and took it with them.

On March 18, the detectives did a walk-through of the house with Catherine and a family friend to determine whether anything was missing. Scherer had kept four ceremonial swords in the hall closet, and one of them was gone. Other missing items were a silver napkin ring holder, two statues from the basement office, and Scherer's and Abendroth's cell phones. Beyond those few items, nothing appeared to be missing. A safe in the home was later drilled open and found to be empty.

Suspicion fairly quickly turned to defendant, who owed money to his parents and was in financial trouble generally. Defendant was ultimately arrested nearly a year after the murders, and the prosecution mounted a complicated circumstantial evidence case against him. The facts and evidence, in brief, were as follows:

Defendant was a professional poker player. Beginning in 2006, he had a sponsor, Tanner Scadden, who by 2007 was putting up half the money for his tournament entry fees in exchange for 40 percent of defendant's winnings. Defendant had some gambling success for a time, but for some months before his parents' murders he had been in a slump and was losing money and betting larger and larger sums. Abendroth, who was a Mormon and who had raised defendant in that faith, disapproved of his gambling. One may surmise she also would have disapproved of other aspects of his lifestyle if she had known.

For defendant, it is safe to say, had acquired a taste for life in the fast lane. His gambling took him to Las Vegas often, though his home was in southern California. In Las Vegas he met a woman named Adrian Solomon and maintained a relationship with her from April 2006 until February 2008. Solomon lived in North Carolina, and their dating relationship took place there, in Anaheim when Solomon was there on business, and on trips to Houston, Mexico, New Orleans, Aruba, Puerto Rico and, of course, Las Vegas. They spent New Year's Eve together in Las Vegas in 2006-2007 and again in 2007-2008.

The only problem was that defendant was married with a three-year-old son (Ernest IV), a fact he actively concealed from Solomon. And Solomon was not defendant's only girlfriend: friends in Las Vegas had seen him with 10-15 different women in the past three years. His friends in Las Vegas did not know he was married. He kept a separate credit card—which his wife did not know about—to entertain his mistresses.

Meanwhile Robyn, defendant's wife, who was a stay-at-home mother, wanted to move out of their small apartment in Torrance into larger quarters. Over Easter 2007, defendant won $70,000 on a pick-six horse race at Hollywood Park, which was used as

4

part of the down payment on a house. In the summer of 2007, the couple found a 3600 square-foot house they liked in Brea, east of Los Angeles. Defendant pulled together all the cash he could for a 20 percent down payment of $176,000, but they still did not qualify for a loan to purchase the house, which cost $880,000.

When the loan fell through, Scherer and Abendroth agreed to lend defendant and Robyn 70 percent of the purchase price of the Brea house. With their own 20 percent down payment and a 10 percent second mortgage carried by the sellers, defendant and Robyn bought the house in September 2007. The parents' loan and the sellers' second mortgage required monthly repayment of interest only; the principal amount was due on each loan in five years. Despite that provision, there was testimony by family members and defendant himself that Scherer hoped defendant would be able to refinance the house sooner so that Scherer and Abendroth could be repaid. Defendant's and Robyn's monthly mortgage payments (first and second) totaled $4,436. They owed $616,000 to defendant's parents.

Defendant continued to win at gambling most of the time until fall of 2007, but then began to lose. Defendant and Scadden had a good year in 2006, but Scadden lost $50,000 through their arrangement in 2007. He believed defendant was spending too much time playing craps and being distracted by multiple women, rather than concentrating on poker.

In February 2008, a professional poker playing friend, Greg Mascio, saw defendant at a casino in southern California and noticed that defendant was "losing more than he was winning." Twice within an hour defendant asked to borrow money, and Mascio ended up loaning him $20,000.

In early 2008, defendant and Robyn decided to try to refinance the Brea house, in part so defendant's parents could get their cash back out of the house. Scadden, who had once been a mortgage broker, tried to help them find financing, but lenders were starting to withdraw stated income loans from the market, and he could not find them a loan. Defendant could not document sufficient income from his gambling efforts. Scadden, who was also in contact with defendant's father for business reasons, told Scherer about

5

defendant's financial bind. When defendant found out, he became very angry and said it was none of Scherer's business.

Up until mid-February 2008, Robyn, who paid the bills, had been able to make the mortgage payments early with money given to her by defendant. When she asked defendant for money on February 15 to pay the mortgages, defendant for the first time was unable to give her money. They also had property taxes and penalties of $6,210 due on April 10, 2008, some of which had been due but unpaid on December 10, 2007.

In late February, defendant and Robyn applied through mortgage broker Antoinette Lucero to refinance their Brea home. Defendant wanted to get as much cash as possible out of the house at refinancing, hopefully $180,000, but Lucero thought the most they could get was about $150,000, as the appraised value of the house had dropped to $850,000. By March 1, 2008, defendant's credit rating had been downgraded. Lucero testified that on March 3 or 4, 2008, she phoned both defendant and Robyn and told them they did not qualify for the refinance.

At the same time defendant's high stakes gambling continued. Within the week before his parents were killed, defendant sent texts to a gambling buddy referring to bets he had placed, including bets in amounts of $2,000 and $6,000 placed on individual sporting events.

As the financial noose tightened, defendant began asking his friends in Las Vegas to help him buy a gun. He claimed he wanted it for his own protection. As a gambler he tended to carry large amounts of cash and said he worried he would be robbed leaving the casinos. By February 14, 2008, he was searching on his cell phone for guns for sale in Primm, near the California border, and also searched for Baker, California. On March 4, 2008, he offered to pay one friend to do something "slightly illegal" by buying him a gun, but the friend refused.

On March 6, 2008, another Las Vegas friend, Billy Kraus, accompanied defendant to a gun shop in Pahrump, Nevada, where (as defendant had researched) there were more relaxed gun purchasing and registration requirements. After the gun dealer skirted answering Kraus's question about the legality of the proposed transaction, Kraus changed

his mind and refused to buy the gun. Defendant seemed disappointed and they spoke very little on their way back to Las Vegas.

On March 7, defendant started the day in Las Vegas, having stayed the night before at Caesar's Palace. According to Scadden, the two of them communicated by cell phone that day, and defendant told him they would have to place their bets that day for March 9 (Sunday), as defendant would be unavailable by cell phone for a time. This was an unusual departure from their normal habit of placing bets on a daily basis. Defendant's cell phone records do not confirm such a call.

At 10:45 a.m. on March 7, defendant made a $500 ATM withdrawal from his and Robyn's checking account. He had also made a $500 withdrawal the day before. At approximately 12:08 p.m. he used a credit card at McDonald's in Primm, Nevada, and sometime prior to 12:21 p.m. he used the same card at a nearby Chevron station in Primm, just across the border from California. Defendant's phone records showed he stopped in the vicinity of Primm for approximately one hour and 25 minutes. On most other trips through Primm to Brea, defendant stopped for roughly half an hour.

Also located in Primm near the McDonald's and Chevron was a Nike outlet store. The prosecution believed defendant stopped at the Nike store and bought a pair of Nike Impax Tomahawk shoes (size 12), a black, orange and silver Ripken youth baseball bat,[4] and a pair of flexible soccer goalie gloves. All three items were sold in a single transaction at the Nike outlet store at 11:38 a.m. on March 7.[5] The purchaser paid in cash.

At 12:27 p.m., defendant called Robyn, who was staying at her parents' house in Fair Oaks (near Sacramento), and told her he was getting ready to leave Las Vegas and head home to Brea. He called her again at 12:50 p.m. At that time his cell phone was

[4] The forensic pathologist testified that a Nike Ripken youth baseball bat introduced at trial could have caused the blunt force injuries to Scherer and Abendroth, and a ceremonial sword representative of those in Scherer's collection could have caused the stab and incisive wounds.

[5] The presence of the warranty card at the murder scene suggests the bat was newly purchased.

7

moving in a southwesterly direction, accessing a cell tower near Baker, California, just over the border from Nevada and on the way to Barstow, California. At Barstow, some 60 miles southwest from Baker on Interstate 15, one can turn west and proceed to Interstate 5 and north toward Pleasanton, or else continue south toward Brea. Defendant has consistently claimed he drove south to Brea.[6]

After that last phone call, Robyn logged onto their bank's Web site and realized defendant had taken money out of their account. She immediately tried to call defendant back but could not reach him. She texted and called him several times for the rest of the day with no response from him. She also called the Brea land line repeatedly without success. One of her text messages asked him why his phone had been turned off at 6:00 p.m. because she thought it was "not normal" for his phone to be off at that time. At 5:30 a.m. on March 8, Robyn finally received a text from defendant in which he told her he felt "well rested" and ready to play bridge with his grandfather.[7]

A cell phone expert tracked defendant's cell phone connection to cell towers leading in a southwesterly direction from Las Vegas to Primm to Baker. The last connection near Baker was at 12:50 p.m. The cell towers ceased tracking defendant's cell phone after that contact, suggesting the phone was either turned off or the battery was dead. There was no further network connection to defendant's cell phone until a call was placed to his grandfather, Ernest Scherer, Sr. (Senior) at 6:36 a.m. the following morning from Brea.[8] All told, defendant's phone was out of contact for 17 hours,

---

[6] A sheriff's deputy drove from Primm to defendant's Brea home on March 21, trying to replicate the route defendant most likely took. It took three hours and twenty-six minutes.

[7] There were no records of defendant's text messages during March 7 to 8, 2008. Defendant's carrier, Verizon, maintained records of the content of text messages for only three-to-five days and a record that a text was sent for only one year. The investigating officers evidently did not subpoena the records within a year.

[8] Pamela Watters Nichols (Watters), a new girlfriend defendant had met through Craigslist after he and Solomon broke up, testified that she and defendant talked on the phone on March 7 for ten minutes at about 3:00 p.m. The cell phone records show a call between them at 12:35 p.m.

46 minutes. This was unusual, as defendant normally used his phone more or less incessantly. Though there had been similar gaps in defendant's phone's connection to a network in the past, no such lengthy gaps occurred from the middle of one day to the morning of the next, or during trips from Las Vegas to Los Angeles.

Defendant showed up at his grandfather's house in Laguna Niguel shortly after 7:00 a.m. on March 8. The two men were slated to play in a bridge tournament. At least one of the bridge players thought defendant behaved normally during the tournament, which lasted until sometime between 4:00 p.m. and 5:30 p.m., but his grandfather testified defendant was "more subdued . . . than usual."

The prosecution's theory was that defendant drove from Las Vegas through Baker and then north to Pleasanton on March 7. After he arrived he entered his parents' house and killed them. Then he drove home to Brea and on to his bridge game.

Defendant drove a 2001 red Camaro convertible with a black top. A security video surveillance tape from the gatehouse at Castlewood showed a similar car entering Castlewood at 8:27 p.m. on March 7 and leaving at 12:42 a.m. on March 8. Detectives were aware that such a car appeared on the Castlewood videos by March 25, but they did not tell defendant about the surveillance tape.

The prosecution ultimately produced an expert witness who testified the video was of a fourth generation Camaro, meaning it was manufactured between 1993 and 2002. However, there was a "freshening up" of the body style in 1998. A total of 8,281 bright red Camaros were manufactured in the United States between 1998 and 2002.

A sheriff's detective testified that, according to his analysis of DMV records, there were 960 2001 V6 Camaro convertibles in California. Twenty-eight 2001 V6 Camaros were registered in Alameda County. In counties adjoining Alameda there were 75 2001 V6 Camaros. It was not possible to narrow down the list by color of the vehicle. Only one 2001 V6 Camaro (a gold or champagne color) was registered in Pleasanton. There were 13 such Camaros registered in adjoining cities. Again, though, these were not necessarily red.

The expert on Camaros testified that defendant's car (which he saw after it was impounded by the sheriff's office) was the same car in the still photos taken from the video surveillance tape. He made that judgment based in part on the wheels and headlights, which were added after market. A prosecution expert on video enhancement noted there were similarities in shape, body design, and tonality between the car on the videotape and defendant's car, but he testified it was not possible, even by enhancing the surveillance video, to definitively identify the Camaro on the video tape as defendant's.

On July 9 and 10, 2008, a pair of detectives (using a single driver) drove the route they think defendant traveled, leaving Primm, Nevada at 12:09 p.m., driving 67.3 miles per hour, and they reached the Scherer-Abendroth home at 7:42 p.m. The trip took seven hours and 33 minutes. The detectives then drove (with the same driver) from the Castlewood home to defendant's house in Brea, leaving at 12:42 a.m. and arriving in Brea at 6:36 a.m. The trip took five hours and 54 minutes at an average speed of 67.4 miles per hour. The driver of the vehicle stayed up until 8:00 p.m. the night following the drive and did not feel tired until about 7:00 p.m.

Beginning March 24, 2008, defendant left his family and went into hiding. Robyn continued to communicate with him for a time by telephone and email. She did not see him, however, from March 23, 2008, until the day she testified at his trial nearly three years later.

By late March 2008, defendant's and Robyn's bank accounts were dwindling, and on April 4, 2008, the bank closed their accounts. Robyn sent defendant an email at the end of May 2008 telling him the Brea house was in foreclosure. They owed $2,743.22 on the second mortgage and would need $10,555.10 by June 15 to avoid additional fees. The house was scheduled to be auctioned in August 2008. Robyn asked defendant to either pay what they owed or to list the house for sale so they could recover some of their equity. After April 2008, Robyn went on county assistance and food stamps, as well as getting a part-time job, to support herself and Ernest IV.

Defendant was apparently in Oregon for at least part of the time he was evading law enforcement. During this period, which lasted about 11 months, defendant placed

10

many personal ads on Craigslist under the heading "men seeking women." Typically the ads said something like this: "I enjoy the finer things in life. A perfect evening for me is sharing a bottle of wine over an excellent dinner. I love the theater, and I love to travel." These types of ads appeared for the locales of Medford, Portland, Seattle, Denver, Minneapolis, Rochester, Buffalo, Las Vegas, Baton Rouge, Memphis, and New Orleans.

Defendant was arrested in Las Vegas in late February 2009. In the meantime Robyn had begun cooperating with law enforcement and had filed for divorce, which was final in June 2010.

No physical evidence linked defendant to the crimes. DNA tests were run on several blood samples collected from the crime scene and compared to known reference samples.[9] Because of the family relationship, when both Abendroth's and Scherer's DNA were present in a sample, defendant and Catherine could not be excluded as contributing to the sample. Many of the samples showed only family members as sources of the DNA, and some were too small or too degraded to provide a usable profile.

One DNA sample from a shoe print (evidence item 13J) contained both a major and minor donor, the minor profile being too small to provide usable information. That sample, in particular, was controversial at trial in that a criminalist from the Alameda County crime laboratory concluded the major profile was contributed by an unknown source, not among the reference samples that had been collected by law enforcement. A retesting by a different lab at the prosecution's request showed that the major profile was Abendroth's. When the sample was returned to Alameda County, it was retested by a different criminalist, with the same results obtained the first time at the county's crime lab. The sample profile was run through local, state, and nationwide DNA databases, with no matches. The prosecution's theory was that the unidentified profile could have been a result of contamination, possibly contributed by a law enforcement source who may have coughed or sneezed in the area, could have been tracked in on a first

---

[9] Reference samples included the two victims, as well as defendant, Catherine, Gray, Jill Lam, and Man San Lam.

11

responder's shoes, or could have been literally something the cat dragged in, as a cat was found running around the crime scene when the sheriff's officers first entered. The defense theory, argued vigorously in closing, was that it was DNA from the blood of an unidentified killer.

In addition to the foregoing evidence, there was more circumstantial evidence tending to a greater or lesser degree to point to defendant's guilt in that it tended to show defendant's high-flying financial aspirations and his increasing financial desperation, as well as his parents' increasing concern about his gambling and financial troubles. The evidence also suggested defendant spent time developing a murder plan. After the crimes he showed knowledge of details not imparted by the sheriff's office and an inclination to destroy or cover up evidence. He also demonstrated bizarre and inappropriate behavior after the murders. And finally, he offered a friend a bribe to testify in a specified manner. We recite the main points emphasized by the parties in more or less chronological order:

- In late 2007 Scherer told Senior he feared defendant had become a compulsive gambler and could not be trusted with any significant amount of money.

- In January 2008, Synhilde MacMillan, Senior's housemate, showed defendant her stock portfolio and he seemed impressed. She told him it had taken her a lifetime to build it up, but "you want it next week." Defendant smiled and said, "You got that right."

- There was evidence that Scherer had been trying to see defendant in February 2008 and defendant may have been avoiding him. Scherer came to visit at the Brea house on February 20 or 21. Defendant told Scherer and Robyn he was going to Las Vegas, but instead he stayed in a hotel in Commerce with Solomon. Defendant and Solomon checked out on February 22 and drove to Las Vegas, where they broke up amicably. On February 24, 2008, Scherer left Brea, telling Robyn he was "going to Las Vegas to find his son." Scherer and defendant met in Las Vegas and drove back to Brea together. When Robyn asked defendant why Scherer needed to see him so urgently, he said Scherer just wanted to catch up, as he and Abendroth had been traveling for the past month.

12

- There was also evidence that Abendroth had experienced unusual bouts of tearfulness around this time.

- On three occasions, including February 28, 2008 (before the murders), defendant did an Internet search for "what foreign countries have nonextradition?"

- On March 8, before the bridge tournament, defendant arrived at Senior's house looking, according to MacMillan, a little disheveled. While watching a business program on television, defendant shouted out three times, "Give me a chance!" MacMillan and Senior, who also overheard the remarks, had never before heard defendant make such a loud outburst.

- On March 9, 2008, defendant paid $140 to have his Camaro washed and waxed and the interior detailed, though he had never before been meticulous about the cleanliness of his car. He also followed his car through the wash tunnel, even though he was told it was not allowed. No other customer had ever done that.

- On March 9, defendant had new tires put on his car, even though its tires were still in good condition.

- The odometer reading on March 9 showed he had driven 2,647 miles since the last reading less than three weeks earlier.

- On March 14, the date his parents' bodies were discovered, defendant told friends his parents' house had been burglarized (though investigators had not made that determination, and his sister, who informed him of their deaths, had not told him there had been a burglary).

- Although he sounded like he was crying during the phone call in which Catherine informed him of their parents' deaths, within fifteen minutes he sounded "detached" and "level-headed" when he told Watters and Kraus about the murders.

- Just over an hour after the phone call from Catherine, defendant called Ralph Rudd, a professional gambler and bookie to whom he owed $31,500, and told Rudd he had "good news and bad news." The good news was that he would soon

be able to pay back the debt. The bad news was that his parents had been brutally murdered. He did not sound emotional.

- Defendant was in Las Vegas when he received the phone call from Catherine. He then drove directly to Pleasanton from Las Vegas. A cell phone expert tracked his phone from Las Vegas to Pleasanton and estimated the trip took six hours and 33 minutes.

- On March 15, while in the Bay Area, defendant opted to stay with a bachelor friend, while Robyn, Ernest IV, Oesterle, Catherine, Gray, and their children stayed in the home of Alameda County Superior Court Judge Joseph Hurley and his wife, Linda, who was a good friend of Abendroth's.

- Beginning on March 15 (the day after the bodies were discovered), defendant showed a determined and pronounced interest in getting access to the Castlewood house so he could get his hands on his parents' wills. He also tried to enlist Judge Hurley's assistance, and he went to Scherer's bank trying to get into the safe deposit box.

- Even though the officers had not told defendant exactly how his parents were killed, defendant said during a sheriff's department interview on March 16 that it "sounds like they were bludgeoned to death, they were hit in the head with a baseball bat."

- On March 15 or 16 defendant went for a walk with Oesterle and told her he thought the police would "come after" him for the murders because he was an heir. When she said he could not possibly have done something like that, he pumped his fist in the air and said, "Yes, I knew it!" When Oesterle looked at him, his face "changed from this big grin to a perfectly flaccid face," which she found "very odd."

- On March 17, Mascio learned from a friend at a casino that defendant's parents had been murdered. When he called defendant to offer his condolences, defendant seemed "nonchalant and kind of matter of fact about the details." When Mascio

14

asked defendant who had killed them, defendant said the police did not know, "but I have an airtight alibi."

- On March 17, 2008, defendant asked Robyn to delete the text messages she had sent him during the 18 hours his phone had not been reachable, and she complied.

- On March 18, Solomon happened to be in San Francisco on business, and defendant took her out for dinner at the Carnelian Room, paying $446 for dinner and wine on his secret credit card. Defendant wanted to stay in Solomon's hotel room, but she refused. Defendant still did not tell Solomon he was married.

- Also on March 18, defendant called Mascio and asked to borrow another $30,000 to $40,000 to pay off debts to other gamblers. He said he could pay back the money after his inheritance from his parents came through. Mascio turned him down because defendant "seemed a little too risky credit wise."

- On the night of March 20 defendant went out to a piano bar with two male friends. After midnight he sent a cheerful text message to Solomon about the outing and later went to an Irish pub. Robyn was not with him.

- The funerals for Scherer and Abendroth were held on March 22. Oesterle paid for the services and was later reimbursed by the Victims Compensation Board and the estate. Defendant gave her no money for the funerals. He told her handling the estates should be easy because Catherine did not care about money and he already had money.

- After the funerals, Oesterle, defendant, and Robyn walked through the Castlewood house without any officers present. Defendant pointed out where Abendroth's body had been found and pointed to some indentations in the wall, saying, "Somebody was swinging something."

- On the night of the funerals, Robyn and defendant drove back to her parents' house in Fair Oaks in separate cars. After learning from Robyn by telephone that the police had searched the Brea house and were then at Robyn's parents' house, defendant suggested they stop in Fair Oaks and pick up a bottle of wine. They

15

stopped at Raley's, and Robyn saw defendant leave a pair of relatively new Rockport shoes, with a distinctive design on the soles, in the parking lot. She went back a few days later to look for the shoes, but they were not there. She told the detectives about this incident on April 1, 2008, and the deputies thereafter retrieved the shoes from Raley's lost and found. Forensic testing showed the presence of defendant's DNA inside the shoes, but there was no blood evidence or other DNA found on the shoes.

- Defendant's Camaro was seized by the sheriff's office on the evening of March 22. A search of the vehicle turned up a map of the western United States, defendant's passport, a Lending Tree letter, a knife, one pair of Speedo shoes, two pairs of golf shoes, and a golf bag containing clubs and two sex toys.

- On the evening of March 22, when Robyn's father offered to let defendant choose a movie to watch on DVD, defendant chose "Hitman" from an extensive movie collection.

- On Easter Sunday, March 23, defendant told Robyn that he was going away for a while. He asked Robyn to meet him outside a comedy club in Hermosa Beach over Memorial Day weekend. He told her to wear sunglasses and to have them on her face if she felt she was being followed, but to hang them on the front of her shirt if she was not being followed.

- On March 24, defendant asked a casino host in Commerce to borrow $10,000. He said he needed the money because he had just paid for his parents' two funerals. He promised he could pay it back in a few months because he would soon inherit over a million dollars. The host gave defendant two $5,000 chips, which he immediately exchanged for cash and left the casino.

- On the same date defendant withdrew $2,000 from his and Robyn's bank accounts.

- On March 24 or 25 defendant began driving to Dallas to see Solomon, who was there on business. She warned him it would "look bad" if he ran from the police

16

but said he was welcome to join her if he got his own hotel room. She was called by a detective in the meantime and learned for the first time that defendant was married and had a young child. When she confronted defendant, he reassured her he was married "in name" only. He told her he would soon be getting about $3 million and offered to pay off her car loan. He continued driving to Dallas, where he stayed in a separate hotel room until March 27. On that date he returned to Las Vegas, telling Kraus he left Texas because Solomon had not been happy to see him.

- Defendant talked to Oesterle on the phone on March 25 and told her he was going into hiding. She had previously given defendant $5,000 of her own money to retain an attorney, but she told him if he ran from the law she would no longer pay for the attorney. He initially said he would return to Robyn but two days later again told her he was going into hiding because the police were asking Castlewood residents if they had seen a red Camaro on the night of the murders. Oesterle warned him that he would look guilty if he ran away. The next day she asked the lawyer to return her retainer.

- Defendant talked to Mascio on March 26 and told him the police were looking at him as a suspect because there was an inheritance involved. Mascio suggested if that were true then Catherine would be a suspect, too. Defendant said she had an alibi but he did not, which contradicted what he had told Mascio the week before. Defendant also told Mascio, if the authorities questioned him, not to tell them he owed Mascio $20,000. Mascio refused to go along with that request.

- On March 27 the detectives told Kraus defendant had a wife and child, and he teared up. When he saw defendant that night he told him he no longer wanted to socialize with him.

- Sometime after March 27, defendant told Kraus "his mother went quickly, but his father put up a struggle or fight."

- On April 11, after Robyn began cooperating with the sheriff's office, she participated in a telephone conversation with defendant while one of the detectives

17

sat next to her and wrote down questions for her to ask. She questioned defendant about the Camaro seen on Castlewood's video surveillance tape; he responded with silence, denials, and requests that she provide him with further details about the video. She exaggerated the clarity of the video and suggested the driver looked like defendant in order to try to get him to talk. Defendant refused to discuss the video further, expressing the belief that the police were listening to the phone call, and they were. Robyn told defendant she had consulted a divorce attorney, and defendant asked her to remain married to him in part because, he said, a wife could not be forced to testify against her husband. He also expressed remorse over the "double life" he had been living and said all he really wanted was to reunite with Robyn and Ernest IV as a family. Robyn said she needed time to think. A recording of the call was played for the jury.

- Within a week, defendant started posting a new barrage of Craigslist ads under the heading "men seeking women."

- Scadden continued to sponsor defendant in poker tournaments after he went into hiding but never again made money doing it. Defendant told Scadden his parents had been beaten to death and his father had been found in a fetal position. (Defendant had declined to see photographs of his parents' bodies when interviewed by sheriff's detectives.) Scadden loaned approximately $15,000 to defendant after the murders for bail, hotels, gambling, and rent; neither those loans nor other sums defendant owed Scadden were ever repaid.

- Defendant's computer showed that on April 20 and 24, he searched for Web sites offering false identification, as well as proxy servers that would allow him to send e-mails while masking the location from which they were sent.

- On April 26, 2008, defendant met a woman named Katie Flash in New Orleans who had responded to one of his Craigslist ads. His ad listed his name as "Bill Franks," and that is how he introduced himself. He told her over dinner in a matter-of-fact way that his parents had been killed in a home invasion robbery in

18

the past eight months. He said he stood to inherit from them on his 30th birthday in July and estimated their estate was worth $4 to $4.5 million.

- He told Flash his parents had been killed in their pajamas and the house had been ransacked, but his father had a lot of cash on him that was not taken. Some things had been taken, but defendant told Flash it "really wasn't a robbery."

- Defendant and Flash went to the Jazz Fest together and he left his parka containing $7,000 in cash at their seats while they walked around. Defendant told Flash he was not worried about getting robbed.

- Defendant told Flash he was a freelance writer working on a novel about a professional gambler who lives in southern California and whose parents are murdered in northern California. His wife, who found out he was cheating on her, leaves him while he is driving home from Las Vegas at the time of the murders. The fictional gambler is unjustly accused of murdering his parents. But defendant assured Flash that the protagonist in the novel would track down the real killer and be vindicated.

- Flash testified that defendant stacked furniture against his hotel room door to try to secure it and kept a 25-foot bungee cord near the window, in case he needed to make a "quick escape."

- Defendant, acting through attorneys, tried several times to access money from his parents' estate while he was on the lam.

- On June 1 Oesterle told defendant during a phone conversation that the family wanted no further contact with him and specifically told him not to contact Senior.

- Defendant showed up unannounced at Senior's house on Father's Day, June 15. Senior called the police. Among the things defendant told the responding officer was that he would soon receive two life insurance checks for $150,000 each and hoped to avoid foreclosure on the Brea house.

- On July 7 and 8, defendant also did computer searches for the "Hans Reiser trial" , and he watched videos of the Scott Peterson trial over and over again while visiting Scadden in July 2008.

- Defendant's hotel room in Las Vegas and his car[10] were searched on July 11, 2008, and a passport application was found, along with a U.S. Department of State document relating to lost or stolen passports. The officers also found three knives in a box designed to hold four knives. In addition, they found a list that appeared to be talking points for a conversation with Robyn, including items such as "do you think I'm dangerous," "what have you told them," "what have they told you," "what happened that Friday," "seen any video," and "I think they know where I am." Defendant explained on cross-examination that these were notes he used during the April 11 phone call with Robin.

- In mid-August 2008, defendant offered $50,000 to Scadden to lie in court if defendant were charged with the murders by claiming that someone to whom defendant owed money had threatened defendant and his family. Scadden initially played along with defendant and suggested using Rudd's name, as defendant owed Rudd $31,500. On September 4, 2008, Scadden told the police about this conversation with defendant.

**The defense case**

Defendant testified on his own behalf, asserting he was at home in Brea when the murders occurred. The defense incorporated the explanation that he had first given the police—that he could not have committed the crimes because he would not have had time to drive from Las Vegas to Pleasanton, kill his parents and ransack their house, and then drive back to Brea by 6:36 a.m. on March 8. And even if he had been able to physically make that trip, he would not have had enough energy left to play in a bridge tournament

---

[10] After his Camaro was seized, defendant asked Oesterle if he could borrow his father's car, a silver Honda. Oesterle agreed but required defendant to execute a promissory note to the estate. Defendant ultimately sold the Honda for living expenses while he was in hiding.

with his grandfather. He testified he had played "vigorous" bridge during the tournament.

Defense counsel argued in closing that the investigation had focused exclusively on defendant from early on, and the authorities failed to properly investigate other potential suspects.

### Third-party witnesses

Defendant also attempted to undercut the prosecution's evidence regarding the rarity of defendant's car by putting on a defense investigator who testified there were 28 1998-2002 Camaros in Pleasanton, Dublin, Livermore and Castro Valley. In Pleasanton there were eight. There was even a fourth generation (1999) red Camaro registered near Castlewood, owned by Toby Baird. A Castlewood resident also testified she regularly saw a red Camaro convertible parked in the club's upper parking lot for about a year prior to the murders and believed it belonged to a resident of the club.

Defendant also presented evidence of others who may have had a motive to kill his parents, including Steven Shaffer, a poker-playing friend of Scherer's. Shaffer had borrowed $50,000 from Scherer to keep up the mortgage on his Santa Cruz condominium and another $75,000 to fix up the property. The condominium was eventually lost to Scherer by foreclosure. Shaffer expressed gratitude to Scherer and denied committing the murders.

Hermann Welm, a poker-playing friend of Scherer's, knew Scherer carried a large amount of cash in a wad of $100 bills. He testified that the Castlewood house was hard to find, so the killer must have been someone who knew Scherer and Abendroth. The defense tried to show the killer could have been a follow-home from one of Scherer's poker games.

A public defender's investigator testified that Jill Lam, a childhood friend of Catherine's, told him she had seen a gold bar in Scherer's safe when she and Catherine opened it a month or two before the crimes occurred, while Lam and her husband were housesitting for Scherer and Abendroth. Lam testified about having attempted to open the safe with Catherine, who thought she knew the combination, but Lam said the

21

investigator's report was wrong. She and Catherine were not able to open the safe. Lam had an alibi in that she was working on the date of the murders and spent March 8 with her family. She drove a silver Corolla.

Lam's husband, Man San Lam, also was called by the defense. He testified that when he was housesitting for Scherer and Abendroth with his wife, he learned that Scherer left the outer garage door unlocked, as well as the door from the garage into the house. He confirmed his wife's alibi. He said his wife had not told him about the safe during the time they were housesitting.

A Castlewood resident testified there had been a suspicious fellow around the club on March 8, 2008, trying to sell meat to the residents. Another Castlewood resident, who shared a driveway with Scherer and Abendroth and could see into their house, claimed he had seen a woman in their kitchen on March 9, 2008, thereby casting doubt on the police theory about when the killings occurred.

Finally, defendant presented testimony of Arisa Kim, who had attended a trapeze class in the Los Angeles area with him on March 10. After the class the two went to a comedy club where defendant dropped his trousers at the comedian's urging. Kim did not see any cuts, injuries or bruises on defendant's upper or lower body, either then or when he was in a sleeveless shirt at the trapeze class. In addition, Detective Michael Norton authenticated multiple photographs of defendant's unclothed limbs and torso taken on March 23, 2008, which evidently showed only a minor injury or sore on defendant's back.

Defendant's testimony

Defendant also took the stand and testified about his background as an Eagle Scout, soccer player, and active member of the Mormon Church through his high school years. His father was a certified public accountant and real estate investor and his mother taught accounting at California State University East Bay. He described a family-centered upbringing in which the whole family often played cards together. Nevertheless there was tension between his parents over Scherer's consumption of alcohol and his gambling. Defendant and Catherine also had a difficult relationship.

22

Defendant graduated from Brigham Young University with a bachelor's degree in economics.

He testified about the early days of his marriage to Robyn, describing how they drifted apart until they were leading "parallel lives." He claimed he wanted to divorce Robyn to be with Solomon, but his father talked him out of it. He also said he broke up with Solomon in September 2007 but they got back together on New Year's Eve in Las Vegas. They broke up finally in February 2008.

Defendant also acknowledged that his mother had become very upset with him when he told her sometime in his mid-twenties that he was no longer a practicing Mormon. She also disapproved of his poker playing.

Defendant started playing poker when he was 21. He described his early days as a professional poker player beginning in 2003. Defendant claimed he was still winning at gambling in September 2007. He admitted he began "struggling" at poker in January 2008 and had to borrow $20,000 from Mascio. He claimed the text messages he sent to his friend about sports bets in March 2008 may have been his view of the likely outcome of the games and not actual bets. He also could have exaggerated the amount of the bets.

He did admit that in March 2008 he was carrying the most debt he had ever carried, but he also testified he had more assets than ever before, and he therefore believed he was not having financial problems. He admitted he had lied to police about the Brea house, his success at gambling, and his financial situation in general during interviews. He claimed he did so because he did not want further police suspicion focused on him. On redirect, he explained that he had enough equity in the Brea house ($146,000) and in the three cars owned by him and Robyn ($21,000 to $23,000) to pay off his $40,000 to $60,000 credit card debt, the $20,000 he owed Mascio, and $10,000 he owed to others.

He admitted, however, that he had tried to refinance the Brea house in February 2008 and had not been successful. He claimed, though, that neither Robyn nor Lucero

had told him the refinance application had been denied prior to his parents' murders.[11] He testified that on March 10, Robyn told him the loan was still in progress. Throughout the month of March he remained ignorant of the status of their refinance application.

Defendant said he withdrew $500 from his ATM on March 6, 2008, so he could pay for the gun he was hoping Kraus would buy him. He had originally begun trying to purchase a gun in 2006 in Mexico. He wanted to buy a gun somewhere outside of California because he disagreed politically with the California waiting period for gun purchases and the registration requirements. He wanted an unregistered gun to comport with his political philosophy.

Defendant spent the evening of March 6, 2008, with Watters. He stayed up late that night, drinking until 3:15 a.m. or 3:30 a.m. He did not tell Watters he was married.

On March 7 he was hung over when hotel housekeeping awakened him. He left Caesar's Palace without checking out, as was his custom. He took another $500 out of his ATM. He could not recall why he needed $500 on March 7 when he had $500 left over from March 6. He thought he probably withdrew the second $500 to play craps or place a sports bet.

It was his custom to stop in Primm to get gas and food, but he could not recall whether he stopped there on that trip. He was certain, however, that he did not go to the factory outlet mall in Primm where the Nike store was located, and he denied buying shoes, soccer gloves, or a baseball bat at the Nike store.

During the beginning of his drive from Las Vegas to Brea on March 7, defendant said he called his grandfather to assure him he would be at a bridge tournament in which they planned to compete on March 8, but Senior did not remember such a call. Cell phone records confirm a call was made by Senior to defendant on that date. Defendant claimed he then drove home to Brea, arriving between 4:00 p.m. and 6:00 p.m., when it

---

[11] This contradicted the testimony of the refinance mortgage broker, as well as that of a real estate broker friend of Scherer's, who testified that on the morning of March 7 Scherer told him defendant's efforts to refinance his house had been unsuccessful and asked if he could perhaps help defendant obtain a loan.

24

was still daylight. He could not recall the exact route he took to Brea that day, but his usual route was to take Interstate 15 to Highway 210, to Highway 57 south.

Defendant responded to the prosecution's proof about his cell phone being dead for nearly 18 hours by explaining that he had been having a battery problem with the phone ever since mid-January 2008, when he was pushed into a swimming pool by Kraus while fully clothed.[12] His cell phone went in with him, and he claimed the phone had been plagued by battery problems ever since. Nevertheless, he claimed he called Robyn twice and Watters once on his way home on March 7 and sent additional text messages. He insisted he was using his phone most of the way home. Defendant testified that he did not notice, on his trip from Las Vegas to Brea, that his phone had gone dead. He told the detectives on March 18 that it died when he was fairly close to home.

Once back home, he had something to eat, watched television, and fell asleep early. He noticed his cell phone had gone dead and put it on the charger. He set the alarm for 5:30 on the morning of March 8. He turned his phone off while he was sleeping and testified this was his normal routine. He did not turn his cell phone back on until the morning of March 8. He explained his failure to answer Robyn's calls to the Brea land line by saying he would never answer that phone because the only people who called it were telemarketers. Despite having charged his phone, he took a charger with him when he went to meet his grandfather for the bridge tournament because the phone had gone dead the day before.

Defendant claimed it was Robyn's idea for him to get work done on his car on March 9. She urged him to get it done while he was in town because she knew his check engine light was on, and he was taking a break from high stakes poker until the refinance came through. He denied that he had previously been less concerned about the cleanliness of his car. He claimed it was "normal" for him to walk through the car wash with his car. He also claimed he put new tires on his car because on the last visit to

---

[12] The cell phone expert testified this would be damaging to the phone but should not have affected the battery life.

25

Big O Tires they had shown him bald spots on his tires where the steel fibers were showing through.[13]

Defendant continued to try to cast suspicion on Rudd by testifying he had received a very nasty voice mail message from Rudd on March 14, 2008. Defendant's debt to Rudd of $31,500 was never repaid, but Rudd denied killing Scherer and Abendroth. Defendant claimed the debt was really owed by Scadden to Rudd for a gambling debt in which defendant simply acted as a middle man.

When defendant talked to Catherine on March 14 and learned their parents had been killed, she told him the house had been "ransacked" and that's why he told friends the place had been burglarized. He pressured the police to let him into the house on March 15 because he needed to get contact information for relatives to let them know about the funerals and he wanted to help the police identify any missing items. He claimed he did not ask about the wills at that time.

He said the reason he stayed with his bachelor friend while the rest of his relatives stayed with the Hurleys was because the Hurleys had only one bed for his family.

He denied going for a walk with Oesterle on March 15 or 16 and denied her entire account of the fist-pumping incident.[14]

In an interview with detectives on March 16, defendant said it sounded like his parents were "bludgeoned to death" with a "baseball bat." He admitted at trial that no

---

[13] This contradicted the testimony of Senior, who had accompanied him to Big O Tires in January or February 2008 and inspected the Camaro's tires, as was his habit, having been an automotive engineer. He testified they were in "fairly good shape." A Big O Tires employee also testified there had been no recommendation to replace the tires at the time of the previous service and the tires he replaced on March 9 were in good condition.

[14] The defense also sought to impeach the testimony of Oesterle, Senior and MacMillan by establishing that in early police interviews they had failed to report circumstances that they testified at trial appeared suspicious to them. To that end defendant called Detective Norton, who testified that in an interview on March 16, Oesterle had not mentioned the fist-pumping incident, and during their initial interview Senior and MacMillan had not mentioned any odd behavior or appearance on the morning of the bridge tournament.

one had told him they were killed with a baseball bat, but testified he had already been made aware they had been bludgeoned before he made that comment.

He falsely told the police that he had had a good year financially in 2007 because he did not want them to think he needed cash. He also told them he did not owe anyone any money aside from mortgages and credit card debt. These were admittedly lies.

Defendant claimed Robyn's deleting the text messages on her phone was her own idea, not his. He testified he left his Rockport shoes in the parking lot of Raley's on the day of his parents' funeral by accident. He denied choosing to watch "Hitman" from Robyn's father's movie collection and said he selected "Lady in the Water" instead.

Defendant explained he had been searching the Internet for countries without extradition because he and Robyn wanted to take a trip together and he did not want to get arrested in a foreign country and sent back to California. (This did not explain his search prior to the murders.)

Defendant admitted he lied to the host at the Commerce casino when he said he had paid for his parents' funerals. He claimed he intended to use the $10,000 he borrowed to pay bills.

He also acknowledged he had lied to many women in order to carry on relationships with them. He admitted he lied to the IRS on his tax returns; he really made more money gambling than he reported to the IRS. Of course, he had lied to his wife about Solomon and lied to Solomon about being single. He also told police, when asked whether there were any problems in his marriage, that he and Robyn got along "very well." He admitted this interview occurred just days after he had been posting Craigslist ads, dating Watters, and dating Kim.

He testified he intended to tell Solomon that he was married, but the detectives beat him to it. When she confronted him he told her the truth. He did not tell her it was a marriage "in name only."

He also intended to tell Kraus he was married, but the detectives beat him to it.

He testified he became concerned when he heard on the radio that the police were looking for anyone who had seen a red Camaro at Castlewood on the night of his parents'

murders.  There was a $25,000 reward for information leading to the killer's arrest and conviction, and he worried that someone would take the video of his car entering Castlewood the preceding Christmas and change the date on the video to frame him and collect the reward.  On cross-examination he admitted that he and Robyn had driven her car to his parents' house the preceding Christmas, not his Camaro.  He still insisted that he could have been recorded entering and leaving Castlewood on a different occasion, perhaps after the murders, and someone could have falsified the videos to make them appear they were recorded on March 7 and 8.

Defendant described his time on the lam, saying he camped out near Sacramento at first, then rented a room in Medford, Oregon for three weeks.  He drank a lot of alcohol and ran a computer search for anything that came to mind, including countries without extradition.  He supported himself with the $10,000 he had borrowed in Commerce, an additional $5,000 chip he had from the Bellagio, and $2,000 he had withdrawn from the couple's bank accounts on March 24.  While in Oregon, he ran Craigslist ads all over the country because he did not know where he was going next.

In late April he drove from Oregon to Louisiana to attend the Jazz Fest, stopping at casinos along the way to earn money playing blackjack.  He spent about two weeks in New Orleans, stayed a few nights in Mississippi, then returned to Las Vegas in late May.  He stayed in Las Vegas for six or seven weeks.  In July he stayed with Scadden for a week in Ogden, Utah.  He moved to Mesquite, Nevada in August 2008, where he met a woman named Kim Olson.  He was living with Olson in her apartment in Las Vegas at the time of his arrest.

In about January 2009, defendant filed, through his lawyer, a motion to attempt to get his share of his parents' estate.  The hearing was scheduled for February 27.  Defendant was arrested on February 23, 2009.

Defendant was aware when he was a child that his parents had made arrangements for him to share in the inheritance of their assets in the event of their deaths, but he would not get the money until he turned 30.  He claimed, however, he had forgotten all about that prior to his parents' murders.

Defendant denied killing his parents, denied that either he or his car were in Pleasanton on March 7 or 8, 2008, denied going to the Nike outlet store in Primm, and denied owning a pair of Nike Impax Tomahawk shoes or a Nike Ripken youth baseball bat. He denied seeing or talking to MacMillan on March 8, and denied he engaged in the outburst she described while watching television. He denied telling Scadden on March 7 that no bets could need to be placed on March 7, denied telling Scadden not to talk to his father about his finances, and denied he offered Scadden $50,000 to lie to the police about a threat supposedly made by Rudd.

### **Rebuttal**

Another Castlewood resident, who had "car recognition" as a childhood hobby, testified she had never seen a red Camaro convertible in the club's upper parking lot. She had, however, seen a red Acura NSX with a black roof parked there.

Baird testified in rebuttal that his 1999 Camaro was not the car he normally drove in March 2008. Baird testified he would not have been driving his Camaro in Castlewood for any reason between 8:00 p.m. on March 7 and 1:00 a.m. on March 8.

Robyn's father confirmed that defendant had chosen to watch "Hitman" on DVD on March 22, 2008, and testified he did not own the movie, "Lady in the Water."

A family friend who had been defendant's scout leader testified that when defendant was a teenager he said his father had set up a large trust fund, which defendant would get when he was 30 years old. Defendant said that was "too long to wait." Defendant thought he should get the money by age 18, or 21 at the latest.

As for the cell phone dead time, the prosecution produced evidence in rebuttal that the moisture sensor inside defendant's cell phone had not been activated.

## PROCEDURAL HISTORY

On September 2, 2009, defendant was charged by information with two counts of murder with use of a deadly weapon, to wit, a "sharp instrument" (Pen. Code, §§ 187, subd. (a), 12022, subd. (b)(1)),[15] and special circumstances of murder for financial gain

---

[15] Further statutory references without code designation are to the Penal Code.

and multiple murders. (§ 190.2, subd. (a)(1) & (a)(3).)  The prosecution did not seek the death penalty.

The case was the subject of intense media attention and publicity, and was assigned for trial before the Honorable Jeffrey Horner, a most experienced and most respected judge.  As will be seen, Judge Horner (hereinafter, for convenience, the court) presided over the lengthy trial with great care and concern, conscientiously and carefully analyzing each of the issues that arose.

Jury trial commenced on November 1, 2010, and continued for some 55 days.  On March 28, 2011, the jury found defendant guilty on both counts, found he personally used a deadly weapon, and found the special circumstance allegations true.

On May 20, 2011, the court sentenced defendant to two consecutive terms of life in prison without possibility of parole, plus two years for the weapon use.  It imposed several fines and fees, including a $10,000 parole revocation fine, suspended pending successful completion of parole.

Defendant filed a timely notice of appeal.

## DISCUSSION

### *Refusal to conduct voir dire on jurors' opinions about gambling and infidelity*
**Factual background**

Defendant first contends that the trial court committed reversible error by refusing to conduct voir dire on certain questions suggested by the defense relating to jurors' attitudes about gambling and womanizing.

The court employed written jury questionnaires for the voir dire in this case, and solicited input from both counsel as to areas it should cover, including questions regarding the prospective jurors' feelings about gambling:

"During the case, you may hear that Mr. Scherer earned his living playing poker. Is there anything about this way of earning a living that will cause you to be unfair to Mr. Scherer or to be prejudiced against him?

"If so, please explain:

"Have you ever played poker?

"Have you ever played poker online?

"Do you watch poker tournaments or games on television, such as the World Poker Tour, the World Series of Poker, or High Stakes Poker?

"Do you have any opinions about the players that you see on televised poker?

"Do you gamble?

"What games of chance have you played?

"Have you played craps?

"Do you know other people who gamble?

"Do you have opinions on whether gambling is moral?

"What are your opinions?

"Do you have opinions on whether gambling should be legal?

"What are your opinions?

"Do you have opinions about people who gamble?

"What are your opinions?

"Do you have any bias or prejudiced [*sic*] against people who gamble?

"If so, please explain?

"Have you been to Las Vegas?

"Do you possess any special knowledge about Las Vegas that we should know about?"

Defendant also proposed the following questions be asked about his extra-marital affairs:

"During the trial, you may hear that Mr. Scherer had extramarital affairs, or met women for dates through CraigsList and other sites while he was married.  Would this fact alone prejudice you against Mr. Scherer or make you unable to be fair to him?  Would this fact alone cause you to evaluate his testimony, should he testify, differently than other witnesses?  If so, in what way?"

31

The trial court said it was not inclined to give defendant's proposed questions because "it's a pinpoint questionnaire, and more importantly it asks jurors to prejudge evidence in the case. . . ."

The final version of the written questionnaire was 22 pages long. An entire section of the questionnaire was entitled "Gambling," and asked the following questions:

"Have you, or a family member, or anyone you know, ever had any experience with gambling? Yes ____ No ____ If yes, who and under what circumstances:

"Have you, or a family member, or anyone you know ever had any specific experience with poker, craps, or sports book betting? Yes ____ No ____ If yes, who and under what circumstances." Beneath each question were three blank lines for prospective jurors to elaborate on their experiences. The questionnaire also inquired whether the juror or a family member had ever been to Las Vegas or Primm. No other questions about gambling were asked, and no questions were asked about infidelity or extramarital affairs.

The issue was raised again when the court presented its proposed questionnaire to counsel, at which time the defense argued it was entitled to ask questions that go to peremptory challenges and specific doctrines or things controversial to the case, while noting that people have strong opinions about gambling and marital infidelity, and arguing that knowledge of this bias is appropriate information to consider. But citing *People v. Carasi* (2008) 44 Cal.4th 1263, 1286 (that a "defendant cannot insist upon questions that are ' "so specific" ' that they expose jurors to the facts of the case. . . ."), the court again found that questions about gambling and marital infidelity might cause jurors to prejudge the evidence. After reviewing a number of recent cases, predominantly capital cases, the trial court ruled that defendant's proposed questions were inappropriate because marital infidelity and gambling were not "grossly inflammatory issues," and the questions were "designed to have jurors prejudge evidence in the case . . . ."

**The law**

Defendant claims these limitations on voir dire amounted to a constitutional infringement because they prevented him from intelligently exercising his peremptory

challenges and thereby deprived him of an impartial jury, relying largely on *People v. Williams* (1981) 29 Cal.3d 392 (*Williams*).

The short answer to defendant's argument is that *Williams* is no longer controlling on this point. (See *People v. Mendoza* (2000) 24 Cal.4th 130, 168, fn. 5; *People v. Leung* (1992) 5 Cal.App.4th 482, 493-494.) In fact, *Williams* is directly at odds with Code of Civil Procedure section 223,[16] adopted as part of Proposition 115 in 1990, which limits voir dire in criminal cases to discovering grounds for a challenge for cause.

Beyond that, even *Williams* left "intact the considerable discretion of the trial court to contain voir dire within reasonable limits." (*Williams*, *supra*, 29 Cal.3d at p. 408; see also *People v. Ramos* (1997) 15 Cal.4th 1133, 1158.) Indeed, both parties agree the appropriate standard of review is abuse of discretion (*People v. Jenkins* (2000) 22 Cal.4th 900, 990; *People v. Taylor* (1992) 5 Cal.App.4th 1299, 1314), and in light of Code of Civil Procedure section 223 it would be difficult to argue otherwise. (See fn. 16, *ante*.)

" '[T]he adequacy of voir dire is a matter " ' "not easily subject to appellate review. . . ." ' " [Citations.] The applicable standard is a demanding one: "Unless the voir dire by a court is so inadequate that the reviewing court can say that the resulting trial was fundamentally unfair, the manner in which voir dire is conducted is not a basis for reversal. [Citation.] . . . " [Citations.] [¶] . . . "The right to voir dire, like the right to peremptorily challenge [citation], is not a constitutional right but a means to achieve the end of an impartial jury. [Citation.]" ' [Citations.]" (*People v. Fuiava* (2012) 53 Cal.4th

---

[16] That section governs voir dire in criminal cases and provides in relevant part: "*Examination of prospective jurors shall be conducted only in aid of the exercise of challenges for cause.*

"The trial court's exercise of its discretion in the manner in which voir dire is conducted, including any limitation on the time which will be allowed for direct questioning of prospective jurors by counsel and any determination that a question is not in aid of the exercise of challenges for cause, shall not cause any conviction to be reversed unless the exercise of that discretion has resulted in a miscarriage of justice, as specified in Section 13 of Article VI of the California Constitution." (Code Civ. Proc., § 223, italics added.)

622, 653-654.)  And, of course, the purpose of voir dire is to ensure a fair and impartial jury—one composed of "indifferent" jurors— not one favorable to the party proposing additional voir dire.  (*Press-Enterprise Co. v. Superior Court of Cal.* (1984) 464 U.S. 501, 510, fn. 9; *Irvin v. Dowd* (1961) 366 U.S. 717, 722.)

Moreover, the rule has often been "reaffirm[ed] that it is not 'a function of the examination of prospective jurors to educate the jury panel to the particular facts of the case, to compel the jurors to commit themselves to vote a particular way, to prejudice the jury for or against a particular party, to argue the case, to indoctrinate the jury, or to instruct the jury in matters of law.' [Citation.]  Therefore, a question may be excluded if it appears to be intended solely to accomplish such improper purpose." (*People v. Williams, supra*, 29 Cal.3d 392, 408, fn. omitted; see also *People v. Carter* (2005) 36 Cal.4th 1114, 1178; *People v. Cash* (2002) 28 Cal.4th 703, 721-722.)  The law is "clear that '[i]t is not a proper object of voir dire to obtain a juror's advisory opinion based upon a preview of the evidence'. . . .  [Citation.]" (*People v. Butler* (2009) 46 Cal.4th 847, 860.)  Rather, a proper inquiry must be " ' "directed to whether, without knowing the specifics of the case, the juror has an 'open mind' " ' " on the issues presented.  (*Id.* at p. 859.)

**Analysis**

The Attorney General cites several death penalty cases in which the issue was the extent to which the specific facts of the case were either allowed or disallowed as the subject of voir dire. (*People v. Solomon* (2010) 49 Cal.4th 792, 837-840; *People v. Tate* (2010) 49 Cal.4th 635, 654-660; *People v. Carasi, supra*, 44 Cal.4th at p. 1286; *People v. Zambrano* (2007) 41 Cal.4th 1082, 1121; *People v. Cash, supra*, 28 Cal.4th at p. 719.)  The trial court, too, relied upon those cases.

The outcome of those cases turned on the degree to which the subject upon which the defendant desired voir dire was so inflammatory as to cause a "reasonable" "otherwise qualified" juror (based on his or her views on the death penalty) to vote "invariably" for death, without regard to mitigating evidence.  (Compare *Cash, supra*, 28 Cal.4th at pp. 717, 719-720 [fact that defendant had killed both his grandparents as a

teenager was so inflammatory that he should have been allowed voir dire to determine whether the fact that he committed murder previously (without revealing the victims were his grandparents) would influence the jurors to vote for death without regard to mitigation] with *People v. Zambrano, supra,* 41 Cal.4th at pp. 1122-1123 [that defendant dismembered the victim after killing him was not so inflammatory that it would cause such an invariable reaction on the part of jurors; voir dire was properly denied] and *People v. Tate, supra,* 49 Cal.4th at pp. 642, 658-660 [defendant had cut off murder victim's finger to steal her wedding rings; not proper voir dire]  The court in *Cash* noted that the matter must be of such an inflammatory nature that a juror subject to its influence could be challenged for cause. (*Cash, supra,* 28 Cal.4th at pp. 719-720.)  Moreover, denial of fact specific voir dire is improper only if the denial was "categorical," with no questions being allowed on the subject.  (*People v. Carasi, supra,* 44 Cal.4th at p. 1286; *People v. Solomon, supra,* 49 Cal.4th at pp. 839-840.)  As these cases demonstrate, the court has repeatedly distinguished *Cash* in the years since it was decided.  (See also, *People v. Valdez* (2012) 55 Cal.4th 82, 164-169 [fact that two prior victims killed by a codefendant were children not so inflammatory as to require fact specific voir dire].)

Applying corollary standards, the defendant's proposed questions were proper only if the subject matter was so inflammatory that it would lead a reasonable, otherwise qualified juror to vote to convict invariably, regardless of the evidence, and only if he was allowed no voir dire on the subject.  We cannot say the evidence of gambling and womanizing met that standard or otherwise justified what the court called "pinpoint" voir dire questions highlighting specific evidence in the case for the jury to "prejudge." Moreover, there were questions about gambling on the jury questionnaire.  The trial court did not abuse its discretion in denying additional voir dire.

We reject defendant's analogy to *Ham v. South Carolina* (1973) 409 U.S. 524, which involved a trial court's refusal to allow voir dire on jurors' racial attitudes in a case involving a drug charge against a bearded local Black man known to be active in the civil rights movement.  (*Id.* at pp. 524-525.)  The case involved issues directly linked to the right to equal protection under the Fourteenth Amendment.  *Ham*'s holding─that

questions about racial prejudice should have been allowed—is a far cry from that which defendant asks us to adopt. (*Id*. at pp. 526-527.) Furthermore, the Supreme Court resolved the question of beards otherwise, holding voir dire about jurors' attitudes toward bearded individuals was not a matter of constitutional right. (*Id*. at p. 528.) Like the questions about beards in *Ham,* defendant's proposed voir dire did not involve racial attitudes or anything else rising to the level of a constitutional right or touching upon such rights. (*Ham*, *supra*, 409 U.S. at p. 528.) Nothing in *Ham* compels us to reverse defendant's convictions. The proposed voir dire on gambling and extramarital affairs was closer to the question of beards in *Ham* than it was to the question of racial prejudice.

The lower federal court cases cited by defendant are materially distinguishable—and in any event not binding on us. (*People v. Clark* (2011) 52 Cal.4th 856, 967.) *United States v. Dellinger* (7th Cir. 1972) 472 F.2d 340 (*Dellinger*), involved the criminal prosecution of Vietnam War protesters at the 1968 Democratic Convention for conspiracy to incite and participate in riots. (*Id*. at pp. 349-350.) The protesters claimed their actions were allowable under the United States Constitution. (*Id*. at p. 354.) The court found it was reversible error to disallow voir dire on, among other subjects, jurors' attitudes about protests against the war in Vietnam and about youth culture in general because of the deeply divisive nature of those issues in our country at that time. (*Id*. at p. 368-370.)

Notably, the Seventh Circuit was interpreting the scope of voir dire under the federal rules, not that required as a matter of constitutional right.[17] (*Dellinger*, *supra*, 472 F.2d at p. 368.) *Dellinger* adopted the rule that defendants were entitled to conduct

---

[17] The federal courts apply a different voir dire statute, which provides in relevant part as follows: "(a) Examination. [¶] (1) In General. The court may examine prospective jurors or may permit the attorneys for the parties to do so. [¶] (2) Court Examination. If the court examines the jurors, it must permit the attorneys for the parties to: [¶] (A) ask further questions that the court considers proper; or [¶] (B) submit further questions that the court may ask if it considers them proper." (Fed. Rules Crim. Proc., rule 24, 28 U.S.C.; see also Fed. Rules Civ. Proc., rule 47, 28 U.S.C.) Thus, a more open-ended inquiry is authorized under federal law.

voir dire so as to "intelligently exercise their peremptory challenges" (*ibid*.), unlike California's statutory system, as discussed above. Moreover, the opinion was no doubt influenced in part by the fact that the questions pertained to the defendants' First Amendment rights, which formed a large part of the defense to the charges faced by the group. (*Dellinger*, *supra*, 472 F.2d at p. 354.) Again, no such constitutional rights are implicated here.

Even federal cases cited by defendant that are more akin to ours factually are not persuasive. In *Lurding v. United States* (6th Cir. 1950) 179 F.2d 419, a tax evasion case, the Court of Appeal said in dictum that defendant should have been allowed to voir dire the jurors on their moral opposition to illegal bookmaking. But the trial court had not only prohibited such voir dire, but had also commented that in its opinion "any person who is qualified to be a juror should be opposed to" illegal gambling. (*Id*. at p. 421.) The judge's comment on the moral issue, together with similar comments and instructions, tended to encourage the jury to judge the defendant based upon his possible bookmaking activities rather than the tax evasion for which he was on trial. No similar circumstances exist in this case.

In *United States v. Clancy* (7th Cir. 1960) 276 F.2d 617, 632, reversed on other grounds in *Clancy v. United States* (1961) 365 U.S. 312, the defendants were tried for making false statements to the IRS, attempting to evade wagering excise taxes, and conspiracy to avoid those taxes. (*Id*. at p. 622.) The judge conducted voir dire "designed to uncover prejudice against gamblers and religious scruples against gambling," including whether the jurors taught Sunday school and whether they would "be prejudiced against anyone who accepts wagers?" (*Id*. at p. 632 & fn. 8.) But the defendants wanted further voir dire on the subject, including " 'Do you believe that gambling itself is immoral, per se, or morally wrong?' [and] 'Do you have a prejudice against people engaged in the business of operating horse books?' " (*Id*. at p. 632, fn. 9.) The Seventh Circuit specifically approved the court's refusal to allow the additional questions (which, not incidentally, closely correspond to those defendant requested in this case) finding them "cumulative and argumentative." (*Id*. at p. 632.)

37

With respect to marital infidelity we also believe the trial court acted within its discretion in finding such evidence was not so inflammatory as to cause an otherwise qualified juror to vote to convict regardless of the evidence. Defendant has cited no cases in which the court held that defendants who have committed adultery have the right to voir dire jurors on their attitudes about that subject. In *Donovan v. Davis* (4th Cir. 1977) 558 F.2d 201, the defendant had been portrayed as a "putative Don Juan" and a skirt chaser in a trial for a theft related offense. (*Id.* at p. 203.) He was later tried on an attempted rape charge, and seven of the jurors from the theft trial were also on his attempted rape jury. The case holding was not related to the adequacy of voir dire. Rather, the defendant's attempted rape conviction was reversed on due process ground because several jurors had been exposed to "evidence outside of the record" that might have affected their impartiality on the attempted rape charge. (*Id.* at p. 204.) No similar extrajudicial information was involved here.

Again, in *United States v. Napoleone* (3d Cir. 1965) 349 F.2d 350, the defendant was convicted of falsely representing he was an employee of the Veterans Administration while actually conducting a "pretext interview" for purposes of investigating a railroad accident for a private company. (*Id.* at p. 351.) The Third Circuit found the trial court had erred in denying voir dire on jurors' "moral or ethical repugnance to liars and lying," where the defense involved an admission that the defendant had lied about the purpose of his investigation, but the defendant denied representing himself as an employee of the Veterans Administration. (*Id.* at p. 354.) Again, the court was operating under a system that allowed voir dire to serve as a predicate to the exercise of peremptory challenges. (*Id.* at p. 353.) Still, the case was decided on an abuse of discretion standard, not as a matter of constitutional magnitude. (*Id.* at pp. 353-354.)

In sum, the cases defendant has cited are entirely distinguishable and do not persuade us that the court abused its discretion in limiting voir dire. Defendant was not deprived of an impartial jury or a fair trial as a result of the court's rulings.

### *Evidence of defendant's extramarital affairs*

Defendant's second claim of error is that the trial court erroneously admitted evidence of his extramarital affairs over his objection and in violation of Evidence Code section 1101.[18]  Defendant insists that his extramarital affairs played no role in motivating his crimes.  He claims this was solely character evidence, irrelevant to issues in the case and unduly prejudicial, which deprived him of a fair trial in violation the due process clause of the Fourteenth Amendment.

This issue was litigated via an in limine motion.  Defendant had requested exclusion of evidence of his dating relationships with Solomon, Watters, and Kim prior to his separation from Robyn, as well as his Craigslist ads after he had last seen Robyn.  He argued the evidence was inadmissible character evidence, irrelevant to motive, flight, or intent, and more prejudicial than probative under Evidence Code section 352.

The trial court refused these requests.  The court found the evidence of his extramarital affairs both before and after the murders was relevant to the murder for financial gain special circumstance allegation.  The evidence showed that both before and after the murders defendant "had an intent to live an astonishingly high level, flamboyant and potentially expensive lifestyle."  His Craigslist ads talked about his love of theater, good food, and fine wine.  "[T]hose are indications of a lifestyle that is simply expensive to maintain."  That defendant stood to inherit a significant amount of money through his parents' deaths made evidence of his jet setting lifestyle, including his affairs, relevant.

---

[18] Evidence Code section 1101 provides as follows:  "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.  [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act.  [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness."

And his Craigslist ads seeking to meet women all over the country after his parents' murders—using untraceable email addresses—also tended to show consciousness of guilt through his flight from law enforcement.[19]

After finding the evidence relevant for a purpose other than proof of defendant's poor character, the trial court proceeded to weigh its probative value against its potential for prejudice under Evidence Code section 352. The court rejected defendant's argument that its prejudicial effect was great, noting the crimes for which defendant was on trial were particularly vicious and violent. The court continued: "To somehow think that in view of those kind of charges the jury is going to somehow be impassioned and inflamed to an irrational state where they reject the law regarding the burden of proof and so on by the fact that [defendant] is dating other women while he's married is just preposterous to me. I don't think that's a reasonable expectation here."

Admissibility of evidence of prior misconduct, being essentially a question of relevance, is reviewed solely for abuse of discretion. (*People v. Carter*, *supra*, 36 Cal.4th at p. 1149; *People v. Kipp* (1998) 18 Cal.4th 349, 369.) We find none here.

We are cognizant that evidence of marital infidelity is in many cases irrelevant, but it nevertheless may be relevant to the issue of motive, as in cases of spousal murder.[20] The same is true here, where it was also relevant to motive.

---

[19] Relying on *People v. Mills* (2010) 48 Cal.4th 158 (*Mills*), the court ruled that the evidence was inadmissible with respect to intent, but was admissible as relevant to motive and flight. *Mills* involved admission of evidence that the defendant took a trip to San Francisco and went snowboarding just days after committing a brutal rape and murder. (*Id*. at pp. 192-194.) The Supreme Court held the evidence was relevant because, based on his engagement in such leisure activities, the jury could rationally find he had "in fact acted with malice aforethought and not in the heat of passion," as he contended. (*Id*. at p. 194, italics omitted.) Similarly, the evidence of defendant's affairs even after the crimes was relevant to proving his desire for a flamboyant lifestyle, including multiple women, motivated the murders.

[20] See *Winfred D. v. Michelin North America, Inc.* (2008) 165 Cal.App.4th 1011, 1026. In that case evidence that plaintiff had a "second family" in Las Vegas was deemed irrelevant in a lawsuit seeking damages for a tire blowout and consequent

Obviously, as set forth in our discussion of the facts, a great number of unflattering details of defendant's lifestyle came before the jury, including his compulsive gambling and unabashed philandering. But these facts were not put before the jury to portray defendant as unlikeable or morally depraved. These were the very behaviors that, according to the prosecution's theory, led defendant to kill his parents so as to expedite his inheritance. As such, they were not introduced solely as character evidence—which is forbidden under Evidence Code section 1101, subdivision (a)—but rather as evidence of motive, which is allowed under subdivision (b) of that same section. (See fn. 18, *ante*.)

"Evidence that 'tends "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive' is generally admissible. [Citation.] Although motive is normally not an element of any crime that the prosecutor must prove, 'evidence of motive makes the crime understandable and renders the inferences regarding defendant's intent more reasonable.' " (*People v. Riccardi* (2012) 54 Cal.4th 758, 815.)

" ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citation.]' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 655.) " 'In a case where the identity of a person who commits a crime is attempted to be proven by circumstantial evidence, such as in the case at bar, evidence of a motive on the part of a defendant charged is always a subject of proof, and the fact of motive particularly material.' " (*People v. Kovacich* (2011) 201 Cal.App.4th 863, 896.)

Defendant argues that a distinction must be drawn between "lifestyle" evidence (such as gambling and overspending), which he concedes was admissible, and evidence of his infidelities, which he claims was not relevant to motive. He claims the evidence

---

injuries. (*Id*. at p. 1026.) The court allowed that it might have reflected on plaintiff's credibility, but it was more prejudicial than probative. (*Id*. at p.1029.)

41

shows much of his dating activity was free of charge because he had "comps" through the casinos for hotel rooms, shows, food, and drinks.

Although defendant's financial problems were largely related to his gambling, they were no doubt compounded by his lavish lifestyle in general, including spending to conduct his extramarital affairs. He traveled to multiple destinations to carry on his affair with Solomon, and there is no reason to think the airfare was free. He took her out for an expensive dinner in San Francisco just days after the bodies of his parents were discovered. After he abandoned his family, he traveled around the country meeting women through Craigslist, luring them in with promises of "the finer things in life" and predictions of an inheritance in the offing. Contrary to defendant's argument in his reply brief , the prosecutor did establish the necessary nexus between defendant's adultery and the financial motivation for the murders.

And though the evidence was admitted for its relevance to motive, since defendant did ultimately testify, it was also admissible as to credibility to the extent it involved dishonesty. (Evid. Code, § 1101, subd. (c).) Because his extramarital affairs involved frequent deception, such evidence also was relevant to credibility. *Winfred D. v. Michelin North America, Inc., supra,* 165 Cal.App.4th 1011, opined that a presumption that " 'promiscuity engenders prevarication' " was only a weak indication of credibility. (*Id.* at pp. 1031-1032.) It held specific acts of infidelity were not to be introduced to prove character. (*Id.* at p. 1037, see also Evid. Code, § 787.) But that rule has been abrogated in criminal cases since the adoption of Proposition 8 in 1982, which added the truth-in-evidence provision of article I, section 28(f)(2) to the state Constitution.

Defendant also claims error in the admission of testimony that two sex toys were found in his golf bag when his car was impounded. The sex toys were, according to Flash, something he told her he used in his relationship with Solomon. The court admitted the testimony as corroboration of Flash's testimony.

Even assuming this testimony should not have been admitted, we cannot find any assumed error was prejudicial. The jury heard a great deal of evidence during this 55-day trial. We cannot imagine the presence of two sex toys in his golf bag, either considered

42

in isolation or cumulatively with the other complained-of evidence, could have so inflamed the jury that it would have convicted him of two horrific murders on the basis of this mildly embarrassing evidence.

### *Prosecutorial misconduct*

Defendant next argues the prosecutor committed misconduct in several respects. He claims the errors were so pervasive as to amount to federal constitutional error, thereby requiring analysis for prejudice under *Chapman v. California* (1967) 386 U.S. 18, 24. But even if not regarded as federal constitutional error, he claims it was state law error and was prejudicial even under a *Watson* standard (*People v. Watson* (1956) 46 Cal.2d 818, 836).

" 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.' [Citation.] When a claim of misconduct is based on the prosecutor's comments before the jury, . . . ' "the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion." ' [Citation.] To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection and ask the trial court to admonish the jury to disregard the improper argument. [Citation.]." (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 305.)

In an apparent attempt to argue there was pervasive misconduct, defendant points to instances of alleged impropriety throughout the various phases of the trial. We address those arguments in turn, although they are to some extent duplicative.

43

<u>During opening statement</u>

1.       "Narcissistic, sociopathic killer"

First, defendant claims the prosecutor committed misconduct when he referred to defendant as a "narcissistic, sociopathic killer" at several points during the trial, including opening statement, initial closing argument, and rebuttal.

In opening statement during the morning session, the prosecutor, referring to the date defendant was born to Scherer and Abendroth, said, "Little did they know that some 29 years later, that that baby boy would grow, and the evidence will show that he grew into a narcissistic, sociopathic killer." Defense counsel did not object. At the beginning of the afternoon session, outside the jury's presence, he did object to the statement as improper argument and requested a curative admonition. The judge agreed it was improper argument in an opening statement and offered to admonish the jury, but he suggested it might only reinforce the prosecutor's statement to give an admonition so disconnected from the offending phrase. Defense counsel agreed and requested that the prosecutor be admonished. The court told the prosecutor, "Don't do that again."

Any argument that this was reversible misconduct was waived by failure to make a contemporaneous objection and is in any event unmeritorious. (*People v. Gonzales and Soliz, supra,* 52 Cal.4th at p. 305.)

Defendant claims the words "narcissist" and "sociopath" constitute explicit psychological diagnoses, and since there was no psychiatric testimony proving defendant suffered from narcissistic personality disorder or antisocial personality disorder (and no good faith belief on the prosecutor's part that such evidence would be presented), the prosecutor's comments constituted an improper appeal to the jury's passions and prejudices. But the jury could not have reasonably understood the prosecutor's remarks in a technical clinical sense. The word "narcissistic" is defined in the Oxford English Dictionary as "characterized or produced by excessive self-admiration." The word "sociopathic" is defined in the Oxford English Dictionary as "exhibiting antisocial, violent, or selfish behaviour," (available online at <http://www.oed.com/> [as of August 28, 2013]) and our Supreme Court has noted that "sociopath" is commonly understood to

44

mean "someone who acts without conscience or remorse." (*Zambrano*, *supra*, 41 Cal.4th at p. 1173.)

As we shall discuss, we find no misconduct in the prosecutor's use of such terms to describe the defendant in closing argument. To the extent the language was too argumentative for an opening statement the court acceded to the defense request to admonish the prosecutor. The prosecutor did not thereafter repeat the words during his opening statement. There was no prejudice from the brief reference, which the evidence ultimately supported.

       2.    *Griffin* error

Next defendant contends that the prosecutor committed error under *Griffin v. California* (1965) 380 U.S. 609, based on comments made during opening statement. The prosecutor referred to Scherer's attempt to see defendant by coming to Brea to visit defendant and Robyn in February 2008. Defendant, meanwhile, left his Brea home to check into the Doubletree Hotel in Commerce with Solomon (having told Robyn and Scherer that he was going to be in Las Vegas). The following comments, objections and rulings followed:

"[MR. NIETO, prosecutor]: Where were you, Mr. Scherer? Was it Las Vegas or Commerce, California, February 19, 2008?

"MR. FOXALL [defense attorney]: Objection, your honor.

"THE COURT: Sustained. Could you rephrase that, Mr. Nieto?

"MR. NIETO: Yes. Where was Mr. Scherer from February 19 to February 22, 2008?

"THE COURT: Give me just a second. Just to clear the record, I'm going to strike the comment there. It was ambiguous. And I would ask Mr. Nieto to rephrase it. So whenever I strike matters, as I said, ladies and gentlemen, disregard them. Treat it as though you didn't hear it.

"Thank you.

"Go ahead, Mr. Nieto.

"MR. NIETO: So the question is where was Mr. Scherer on February 19 to February 22, 2008?"

45

A few minutes later at the next break, defense counsel asked for an admonishment on his sustained objection. He argued that posing a question to defendant constituted *Griffin* error in violation of his Fifth Amendment rights and as such was misconduct. "It was insufficient to ask the jury simply to disregard what [the prosecutor] did when he addressed a question to [defendant] in his opening. What he did was improper. And the jury needs to be told it was improper. He is not entitled to address questions to a defendant, who has a Fifth Amendment right and that rhetorical device was plainly designed to get the jury to expect that [defendant] will answer that question. And I think there needs to be a stronger and proper admonition, because I think that qualifies as misconduct." The prosecutor responded that he was commenting on the evidence and was not directing a question to defendant. Indeed, defense counsel seemed to acknowledge that the prosecutor had simply misspoken. He said, "Mr. Nieto quickly did rephrase when he was stopped short and said, 'Where was Mr. Scherer?' That is the question. The question isn't 'Where were you, Mr. Scherer?' directed at Mr. Scherer."

The trial court considered the prosecutor's question a rhetorical one that had been dealt with adequately by instructing the prosecutor to rephrase his comment and by striking the prior comment. Trial counsel insisted the jury be admonished that defendant had no obligation to testify and the failure to do so could not be considered against him. The trial court again refused stating, "I don't believe that that comment was intended to nor did it have the effect of being a comment on failure to testify, an invitation to testify or anything of the like." It found the comment did not even "come close" to *Griffin* error.

We agree. The jurors were admonished to disregard the comment , and we presume they followed that instruction. (*United States v. Olano* (1993) 507 U.S. 725, 740; *People v. Avila* (2009) 46 Cal.4th 680, 719; *People v. Sisneros* (2009) 174 Cal.App.4th 142, 152-153.) The prosecutor immediately rephrased his remark to indicate the rhetorical nature of the question. We see no *Griffin* error.

Moreover, since defendant *did* testify, the comment could not have been understood by the jury to be a comment on defendant's exercise of his right to remain silent. He did not exercise that right and by testifying waived it. (*People v. Redmond*

46

(1981) 29 Cal.3d 904, 911.) And even if this single passing comment could somehow be conceived of as *Griffin* error, we would find it harmless beyond a reasonable doubt. (*People v. Turner* (2004) 34 Cal.4th 406, 421; *People v. Hovey* (1988) 44 Cal.3d 543, 572.)

### 3. Commenting on Craigslist ads

The trial court ruled in limine that the Craigslist ads were admissible because they were relevant to motive, flight, and consciousness of guilt through use of an alias. During opening statement the prosecutor commented that the Craigslist ad posted in Las Vegas through which defendant met Watters (before the murders) was placed at a time when "we know he's married and has a child back home in Brea." Second, he commented that when defendant met Flash in New Orleans through such an ad, she spent the night in his hotel room. Trial counsel had objected on grounds the reading of Craigslist postings by the prosecutor was beyond the scope of the in limine ruling, but the court overruled the objections.

Defendant now raises those two specific comments as prosecutorial misconduct. Counsel raised no objection to the specific comments of which he now complains, however, and the issues have not been preserved for appeal.

On the merits, too, we find the arguments unpersuasive. Citing cases for the proposition that a prosecutor may not intentionally introduce inadmissible evidence (*People v. Chatman* (2006) 38 Cal.4th 344, 379-380; *People v. Smithey* (1999) 20 Cal.4th 936, 960), defendant contends the prosecutor improperly used the evidence that had been ruled admissible under Evidence Code section 1101, subdivision (b), to lead the jury to draw impermissible character inferences. But we deal here with an opening statement, not the introduction of inadmissible evidence.

The purpose of an opening statement in a criminal trial is to inform the jury of the evidence the prosecution intends to present and to prepare the minds of the jury to follow and to more readily discern the materiality, force, and effect of such evidence. (*People v. Farnam* (2002) 28 Cal.4th 107, 168; *People v. Wash* (1993) 6 Cal.4th 215, 257.) The Supreme Court has said, " 'remarks made in an opening statement cannot be charged as

misconduct unless the evidence referred to by the prosecutor "was 'so patently inadmissible as to charge the prosecutor with knowledge that it could never be admitted.' " ' " (*People v. Dykes* (2009) 46 Cal.4th 731, 762.) Having received an in limine ruling that allowed evidence of defendant's relations with Watters to be introduced, it was not misconduct simply to remind the jury that he was married at the time.

The fact that defendant sought out further contact with women within roughly two weeks after breaking up with Solomon was relevant to motive. Even after ending one lengthy affair, defendant was already seeking to initiate another as part of what he himself called his "double life." Dating Watters fit exactly into the prosecutor's theory that defendant was so attached to his high roller lifestyle that he was driven to kill to maintain it.

Moreover, even if the remark were to be deemed improper, the prospect of prejudice is remote. There is no question but that defendant was married when he was carrying on with Watters. Given that Robyn was a witness against him at trial, his marital status could not have escaped the jury's notice as the trial progressed, and the verdict could not possibly have been influenced by this simple statement of fact. Nor do we think the jury would have convicted defendant of two heinous murders simply because it found his philandering distasteful. The remark neither infected the trial with unfairness nor constituted a "deceptive or reprehensible" tactic.

As for the comment about Flash spending the night with him in New Orleans, it was clearly brought up for the purpose of showing defendant barricaded his hotel room and prepared an escape via bungee cord through the hotel window in the event the police tracked him down. To the extent some jurors may have disapproved of his unceremonious intimacy with Flash, there is no reason to think the prosecutor's passing remark could have carried much weight in relation to the whole of the evidence. Even if we could agree there was misconduct—and we do not—it would not have been prejudicial because "there is no reasonable likelihood that the prosecution's line of

48

argument misled the jury as to its task in determining" whether defendant murdered his parents.  (*People v. Samayoa* (1997) 15 Cal.4th 795, 842-843.)

<u>During trial</u>

1.      Failing to advise the court a juror had smiled at defendant during trial

Defendant claims the prosecutor committed misconduct by failing to promptly report juror misconduct to the court.  The juror misconduct in question was the fact that one of the jurors smiled at defendant at various times during the trial.  Indeed, this juror wrote letters to defendant after the trial, which he produced at the sentencing hearing. The prosecutor remarked, "it was clear that there were nonverbal communications going on between the defendant and the juror in terms of smiles and things of that nature throughout the trial."  Defense counsel agreed he had noticed such conduct by the juror, but asserted defendant did not return her nonverbal communication.

Defendant claims on appeal that the prosecutor's failure to report the juror's misconduct during the trial violated rule 5-320(G) of the Rules of Professional Conduct and Business and Professions Code section 6068, subdivision (a).  The former provides: "A member shall reveal promptly to the court improper conduct by a person who is either a member of a venire or a juror, or by another toward a person who is either a member of a venire or a juror or a member of his or her family, of which the member has knowledge."  The latter merely requires an attorney "[t]o support the Constitution and laws of the United States and of this state."

"It is serious misconduct for jurors to engage in discussion with the parties, their counsel, or witnesses."  (7 Witkin, Cal. Procedure (5th ed. 2008) Trial § 331, p. 385, citing *Wright v. Eastlick* (1899) 125 Cal. 517, 519-520 [parties socialized with two jurors]; *Garden Grove School Dist. of Orange v. Hendler* (1965) 63 Cal.2d 141, 144 [counsel talked with jury foreman during recess].)

In this case, there was no evidence that the juror actually exchanged words with defendant or anyone associated with him before the verdicts were entered.[21] We have been directed to no case holding that a juror's merely smiling at a party rises to the level of "improper conduct" under rule 5-320(G) of the Rules of Professional Conduct. Whatever other "nonverbal communications" occurred are not described in the record. The juror may have been nonverbally communicating a sympathetic attitude toward defendant. But even assuming for purposes of argument that nonverbal communication between a juror and a party may amount to juror misconduct, we would not find reversible error on this record.

First, there was no objection in the trial court, and the issue has therefore been forfeited. (*People v. Bolden* (2002) 29 Cal.4th 515, 562-564; *Dimmick v. Alvarez* (1961) 196 Cal.App.2d 211, 216-217.) Had defense counsel objected to the prosecutor's failure to report the juror's nonverbal communications as misconduct at the time the subject first arose, a more complete record could have been made as to exactly what kind of "nonverbal communication" was observed.

Second, defense counsel was equally obligated to report such misconduct (if it amounted to that) and failed to do so, evidently believing the juror's smiles reflected a favorable disposition toward his client. Though we know prosecutors are held to an especially high standard of conduct, in this circumstance there should not be one standard for prosecutors and a different standard for defense counsel who, for tactical reasons, violates the same professional rule.

Third, the juror, if she had a bias, evidently had a bias in defendant's favor, and it is difficult to imagine how he was prejudiced thereby. The juror ultimately found defendant guilty of both matricide and patricide, evidently overcoming whatever

---

[21] There was actual communication (written and perhaps otherwise) between the juror and defendant after the jury's verdict was returned and the jury had been dismissed. Such communications could not have been prejudicial because they occurred exclusively after the verdicts had been rendered. (Cf. *Wooddall v. Superior Court* (1986) 185 Cal.App.3d 399, 401 [§ 95, attempting to influence a verdict, does not apply after verdict rendered and jury dismissed].)

50

attraction she may have felt towards him during the trial. It therefore appears her initial partiality in favor of defendant did not translate into an impact on the verdict. We certainly will not reverse the judgment because defendant was unable to parlay this flirtation (if that's what it was) into a hung jury.

    2.       Cross-examination of defendant

    Defendant testified on his own behalf and denied killing his parents. At the beginning of his cross-examination, the prosecutor showed defendant pictures of his parents' dead bodies and asked the following series of questions, which defendant now claims constituted misconduct:

"BY MR. NIETO:

"Q. Do you see that photograph?

"A. I do.

"Q. Did you give your mother the opportunity to say your name before you hit her the first time?

"Mr. Foxall: I would object as argumentative and improper.

"The Court: No, overruled. This is cross-examination.

"The Witness: I did not hit my mother.

"BY MR. NIETO:

"Q. Did you give her the opportunity to ask you why?

"Mr. Foxall: It is an improper question, your Honor.

"The court: Overruled. You may answer.

"The Witness: I did not hit my mother.

"BY MR. NIETO:

[¶] . . .[¶]

"Q. Did you give your father the opportunity to say anything before you hit him the first time?

"MR. FOXALL: Objection.

"THE COURT: Over—

"MR. FOXALL: I have a motion.

"THE COURT: Overruled. You may answer.

"THE WITNESS: I did not hit my father.

"MR. NIETO: Did you give him the opportunity to ask you why?

"MR. FOXALL: Objection; it's improper.

"THE COURT: Same ruling. Overruled. You may answer.

"THE WITNESS: I did not hit my father."

Defendant contends that this series of questions improperly asked the jury to view the crime through the eyes of the victims, was argumentative, and improperly "appealed to the emotions of those jurors who had children." Contrary to defendant's claims, this brief series of questions was within the limits permitted for cross-examination.

True, it is misconduct for a prosecutor to ask the jury to view the crime through the victim's eyes. (*People v. Stansbury* (1993) 4 Cal.4th 1017, 1057 (*Stansbury*); *People v. Fields* (1983) 35 Cal.3d 329, 362-363; *People v. Vance* (2010) 188 Cal.App.4th 1182, 1188 (*Vance*).) But the cited cases deal with misconduct in closing argument, not the allowable scope of cross-examination of a testifying defendant, which is very wide. (*People v. Hawthorne* (2009) 46 Cal.4th 67, 99-100; *People v. Mayfield* (1997) 14 Cal.4th 668, 754; *People v. Cooper* (1991) 53 Cal.3d 771, 822.) The prosecutor's questions concerned defendant's actions on the night of the murders, not the victims' feelings about his actions. We find no misconduct, but even assuming it occurred, we would not find it prejudicial, given the wealth of evidence against defendant. These few questions cannot reasonably be seen as affecting the outcome of this lengthy and complex trial.

<u>During closing argument</u>

1.      "Narcissistic, Sociopathic Killer"

The prosecutor opened his closing argument with these words: "At varying points throughout this trial, particularly as you exited and entered this courtroom, you have been within feet of a narcissistic, sociopathic . . . [¶] . . .[¶] killer." He returned to this theme at several points during his argument with phrases such as "narcissistic personality,"

"self-righteous narcissistic sociopath," and "narcissistic view of the world." Defense counsel again objected, but this time the objections were overruled.

The trial court acknowledged it had ruled the use of these words was improper during opening statement because at that stage of the proceedings they were argumentative. During closing argument, though, "[t]he district attorney is allowed to use graphic and colorful language to describe the defendant." Having had his initial objections overruled, defense counsel stopped objecting to such references. We do not consider the issue waived. We do, however, believe it lacks merit.

"A prosecutor is allowed to make vigorous arguments and may even use such epithets as are warranted by the evidence, as long as these arguments are not inflammatory and principally aimed at arousing the passion or prejudice of the jury." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1251; see also *People v. Wharton* (1991) 53 Cal.3d 522, 567.) On the evidence presented the prosecutor could fairly argue that defendant was a self-obsessed, remorseless killer. Both the words "narcissist" and "sociopath" are used in common conversation without any technical psychiatric implications. The prosecutor elaborated on the "narcissist" label, arguing that defendant would "take[] advantage of other people to achieve his own goals," had "excessive feelings of self importance," "exaggerate[d] [his] achievements and talents," was "[p]reoccupied with fantasies of success, power, beauty, intelligence or ideal love," had "unreasonable expectations of favorable treatment," "need[ed] constant attention and admiration," "disregard[ed] the feelings of others," "ha[d] obsessive self-interest" and "pursue[d] mainly selfish goals," giving examples of defendant's behavior that fell into each category. By including this list of narcissistic traits the prosecutor made clear he was using the term in its everyday sense and not in a technical diagnostic sense.

The evidence supported his arguments. For instance, both in his testimony about his marriage and in his Craigslist ads, defendant suggested he needed a well-educated woman to keep up with him intellectually. Robyn, he complained, did not enjoy reading The Economist, as he did, nor did she enjoy news and business television programs, but rather liked soap operas and reality shows. When defendant dropped out of sight,

53

although he was living on borrowed money, he continued to attempt to lure women to him by boasting about his life of leisure and high style and his fabricated accomplishments (such as his "novel").  The prosecutor argued he also showed himself to be narcissistic by referring to himself as an "economist" simply because he has a bachelor's degree in economics.  That he thought he could outsmart the police was also evident from his planning of the crime.  And he apparently believed he could convince the jury to believe him, even though he denied or flatly contradicted the testimony of many witnesses, including his own family members.  The label "narcissist" was a fair comment on the evidence.

Likewise, labeling a defendant a "sociopath" has been specifically held not to amount to misconduct.  (*People v. Friend*  (2009) 47 Cal.4th 1, 84; *Zambrano*, *supra*, 41 Cal.4th at p. 1173.)  In *Friend*, the court stated that in describing the defendant as a "sociopath" the prosecutor was not improperly stating an expert opinion but rather was "using language in common currency to describe his interpretation of the evidence. . . ." (47 Cal.4th at p. 84.)  And in *Zambrano* the court found "the label of sociopath . . . certainly fit defendant, based on the facts of his crimes." (*Zambran, supra,* 41 Cal.4th at p. 1173.)  So, too, here.

The nature of the crime was particularly heinous.  Defendant killed his own parents in a brutal attack, driven by greed and an unquenchable desire to live a hedonistic lifestyle.  His conduct following the murders was callous and inappropriate—one could easily say "remorseless."  And he continued trying to collect his inheritance from Oesterle even after he disappeared and abandoned his family.  We find no misconduct in any of the references to these terms in closing argument.

2.     Purporting to supply Abendroth's testimony

During closing argument the prosecutor referred to a letter written by Abendroth to defendant in August 1999, asking him to stop gambling.  The letter was in evidence. In it Abendroth said, among other things, that gambling "is extremely destructive to a marriage" and, "If you want your marriage to be eternal, you must quit gambling." "Gambling," she said, "can be psychologically addictive," warning that she and Scherer

both had a "high tolerance for risk" and that defendant "probably picked it up." "The problem with seeing how close to the edge of the cliff you can walk is that you may slip and fall off." She advised him, "Get your life in tune with your spirit and listen to it."

The prosecutor argued: "The evidence has shown that [defendant] had no concern for anybody but himself for virtually his entire life. And it led him to the edge of the cliff that his mother, in a letter, in a voice from the grave, prophetically expected and anticipated that his lifestyle . . . ." At that point defense counsel objected that it was improper argument. The trial court overruled the objection, and the prosecutor continued: "On March 7th, 2008, in the days leading up to it where he planned the murders of his parents, [defendant] got too close to the edge of that cliff that his mother spoke of."

Defendant relies on *Drayden v. White* (9th Cir. 2000) 232 F.3d 704, 712-713, to argue this was misconduct, claiming the "voice from the grave" comment "improperly suggest[ed] the dead victim [was] giving testimony in this case." But in *Drayden* the prosecutor's conduct was much more blameworthy. He sat in the witness chair during closing argument and delivered a hypothetical soliloquy through the voice of the dead victim. (*Drayden, supra,* at pp. 711-713)

The prosecutor in defendant's case characterized the letter as "prophetic[]" and therefore steered clear of fabricating testimony on behalf of defendant's dead mother. The letter itself was written by Abendroth, so the jury knew what her words were and when they had been written. It was clear this was not her "testimony" "from the grave" but rather her fearful prediction, which the prosecutor argued had come true. This was not improper argument.

3.     Violating the prohibition on "Golden Rule" arguments

Defendant next asserts that in references to his murder of Abendroth, the prosecutor referred to facts not in evidence and appealed to the jury's passions, and in doing so violated the prohibition on a prosecutor's use of such "Golden Rule" arguments. In a "Golden Rule" argument, "a prosecutor invites the jury to put itself in the victim's position and imagine what the victim experienced. This is misconduct, because it is a

55

blatant appeal to the jury's natural sympathy for the victim." (*Vance*, *supra*, 188 Cal.App.4th at p. 1188; see also, *Stansbury*, *supra*, 4 Cal.4th at p. 1057; *People v. Fields*, *supra*, 35 Cal.3d at p. 362.)

In his closing argument, the prosecutor reviewed the elements of murder, noting that one factor influencing the element of malice could be "[t]he types of weapons used, a sharp instrument, and a Nike youth baseball bat. You can't get any more personal or up close than with the types of weapons used. [¶] This is not something that's sanitized from a distance with a long-range rifle or even a hand gun that separates the murderer from his victims. Think about the number of times that Charlene Abendroth's skull was hit with a baseball bat just like this one. [¶] Very personal. Compare the number times that Charlene Abendroth was hit in the skull with this baseball bat with the number of times that her husband was hit. She was hit much more. Many more times. It was something personal there. Very personal. So when you consider malice, you think of the types of weapons used. [¶] Did Charlene Abendroth have time to call out her son's name? [¶] Did she have time to ask him why after everything she and her husband had done for him? [¶] What it must have sounded like to hear this bat hit their skulls. [¶] The sound the defendant heard repeatedly—"

At that point trial counsel objected that it was improper argument. His objection was overruled.

The prosecutor's argument may have bordered on improper territory in the last few sentences. But when he asked the jury to imagine "[w]hat it must have sounded like to hear this bat hit their skulls," he immediately clarified that he was talking about what it must have sounded like to defendant, who heard it "repeatedly."

This was not a situation like that in *Stansbury* where the prosecutor asked the jury to consider how the child victim must have felt as she was sexually assaulted and murdered. (*Stansbury*, *supra*, 4 Cal.4th at p. 1057.) Nor is it similar to *Vance*, where the prosecutor told the jury "to literally relive in your mind's eye and in your feelings what [the victim] experienced the night he was murdered." (*Vance*, *supra*, 188 Cal.App.4th at p. 1194.) Given the entire context, the argument here was not improper, but was meant to

emphasize the element of malice in defendant's actions by pointing out some calculated and callous aspects of the crimes. And even if considered misconduct, it was not prejudicial. (*Watson, supra*, 46 Cal.2d at p. 836; see *Stansbury, supra*, 4 Cal.4th at p. 1057.)

4.      Commenting on defendant's testimony as appealing to jury's passion

Next defendant argues that certain parts of closing argument improperly appealed to the passions and prejudices of the jury. We see it differently.

During cross-examination, defendant admitted that part of being a professional poker player is being able to deceive other players. He testified that a "tell" is "a visual or audio cue" of the strength or weakness of a player's hand. The prosecutor asked defendant what his tell was and defendant replied, "I don't know." He added that if one knows something is a tell, then it would cease to be a tell.

During closing argument, in attempting to persuade the jurors not to believe defendant's explanation that his phone was out of service because it had fallen into a swimming pool, the prosecutor argued: "The defendant says to the detectives that you can track me almost to my door. Why does he say that? Not because it is true. We know that. [¶] But he says it because he wants them to believe it. Maybe they won't check. And even if they do, he's got the explanation. Remember the . . . phone in the pool? So he's got it all figured out. All these little pieces, he's going to explain it all away. [¶] But we know that his communication ceases just past Baker. [¶] We asked [defendant], 'Where is Baker?' [¶] 'Well, I don't know. I don't know where Baker is.' [¶] Lie. Absolute lie. [¶] He researched it. He knows exactly where it is. And he's driven through it countless times before. [¶] 'Is Baker near Brea?' [¶] 'Well, I would have to see it on a map. I would have to see all three locations on a map.' [¶] The absolute indignation, the self-righteousness. It's offensive. His demeanor when he testified about that is just absolutely offensive. It makes my blood boil and it should make your blood boil."

At that point trial counsel objected that it was improper argument. The trial court overruled the objection, and the prosecutor continued: "He can't handle the truth when

57

it's presented to him. Okay?  Remember when he first testified, I said, 'What's your tell Mr. Scherer?  What's your tell?  Everybody's got a tell.  What's yours?'  [¶] . . . [¶] I will tell you what his tell is.  He needs time to think about what to say.  You go off script, he can't handle it.  You get close to the truth, he can't recall.  That's his tell.  [¶] . . . [¶] It's clear that he's trying to think.  He's trying to buy time.  He has to come up with an explanation of why his communication ceases at Baker.  And there is no reasonable explanation.  There's lots of tells."  The prosecutor then argued that defendant's statements to the police and his testimony were clearly false, but defendant felt he could say whatever he wanted because he "thinks he's smarter than everyone."

Defendant emphasizes the passage about defendant's demeanor being so "offensive" that it should "make [the jurors'] blood boil . . . ."  He compares the case to *People v. Boyette* (2002) 29 Cal.4th 381, 434, where the Supreme Court said that "comment during the guilt phase of a capital trial on a defendant's courtroom demeanor is improper."  But that was a case in which the defendant chose not to testify, and the prosecutor argued that his apparently pleasant demeanor in the courtroom should not fool them into thinking he did not commit the crimes.  (*Ibid*.)

In our case, the defendant took the witness stand.  It is perfectly proper for a prosecutor to comment on the demeanor of a defendant while testifying.  That is one of the things the jury may—indeed, was instructed to—consider in evaluating the believability of his testimony.  (*People v. Jackson* (1989) 49 Cal.3d 1170, 1205; Evid. Code, § 780; CALJIC 2.20 [given to the jury in this case].)

To argue that defendant's profession of ignorance about the location of Baker was an "absolute lie" also was not improper.  (*Zambrano*, *supra*, 41 Cal.4th at p. 1172 [not misconduct to call defendant a "liar"].)  When a defendant's testimony contradicts the strong evidence of his guilt, it is not improper to call him a liar.  (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1030 [" 'snake in the jungle,' " "slick," "tricky," a " 'pathological liar,' " and " 'one of the greatest liars in the history of Fresno County' "]; *People v. Reyes* (1974) 12 Cal.3d 486, 505 [" 'monstrous lie,' " " 'garbage,' " " 'cocky' " and " 'ice running through his veins' "].)  This is especially true because the prosecutor then gave a

58

reason why defendant's profession of ignorance could be recognized as a lie: "He researched it. He knows exactly where [Baker] is. And he's driven through it countless times before." There was no misconduct.

5.    Vouching

Defendant argues the prosecutor improperly vouched for Senior as a witness. Senior was 95 years old at the time of trial. At one point in closing argument, the prosecutor was reviewing factors to be considered in assessing the credibility of a witness. In discussing factors that made Senior credible, the prosecutor referred to him as "A man described as from perhaps the greatest generation." The comment passed without objection.

Soon thereafter, in discussing the testimony about the condition of defendant's tires when he replaced them on March 9, 2008, the prosecutor recalled that Senior testified he had examined defendant's car not long before that date and the tires were in good shape. Defendant himself testified the tires were so worn they had steel fibers protruding. In arguing that Senior was more credible, the prosecutor said: "This is a man who knows a little thing about cars, a thing or two about cars. [¶] Despite his automotive—or in addition, I should say, to his automotive engineering career, you saw him sit there on the witness stand. And when I tried to broach the subject of what he had done on his way up here to testify, he was very humble, modest, and didn't want me to bring it up. [¶] But I brought it up anyway, because it shows the caliber of the man, the quality of his testimony, and the character of the man. A man from what has been described as the greatest generation." Defense counsel's "improper argument" objection was overruled.

The prosecutor's reference was to Senior's reluctant testimony that, while he and Oesterle were driving up to the trial, Oesterle's car had a flat tire. Senior got out of the car and changed the tire.

The trial court later explained its reasoning in overruling the objection, stating that the prosecutor had made an implicit reference to Tom Brokaw's book entitled, The Greatest Generation, which described people in Senior's age group. The court concluded

59

this was a "generalized literary reference, I think it falls well within the kinds of references to things which are in the public domain and there's nothing I think offensive to legal principles. . . ." The trial court was correct. The prosecutor's reference was one permissibly " 'drawn from common experience, history or literature.' " (*People v. Wharton*, *supra*, 53 Cal.3d at p. 567.)

*People v. Martinez* (2010) 47 Cal.4th 911 (*Martinez*), does not support defendant's argument that this was improper vouching. In *Martinez*, the prosecutor argued that a witness was credible because she had given prior consistent statements to the police. Those prior statements were not in evidence. The Supreme Court held, even assuming this was misconduct, it was harmless. (*Id*. at pp. 958-959.)

This case is different. A prosecutor is said to vouch for the credibility of a witness when he or she " ' "attempt[s] to bolster a witness by reference to facts outside the record." " [Citation.] Thus, it is misconduct for prosecutors to vouch for the strength of their cases by invoking their personal prestige, reputation, or depth of experience, or the prestige or reputation of their office, in support of it. [Citations.] . . . Nor may prosecutors offer their personal opinions when they are based solely on their experience or on other facts outside the record. [Citations.]" (*People v. Huggins* (2006) 38 Cal.4th 175, 206-207.) However, a "prosecutor may comment upon the credibility of witnesses based on facts contained in the record, and any reasonable inferences that can be drawn from them . . . ." (*Martinez*, *supra*, 47 Cal.4th at p. 958.)

The reference to Senior being part of the "greatest generation" was not a reference to facts outside the evidence, nor was the prosecutor voicing an opinion based on his own experience. It was a literary reference to a widely known book. Senior's age was a matter of record, and his place in the "greatest generation" was therefore an inference the jury could properly draw.

When the prosecutor argued that Senior should be believed because of the "caliber of the man, the quality of his testimony, and the character of the man," he was basing those conclusions in part on Senior's gentlemanly conduct during the tire-changing incident and in part on his demeanor at trial (noting the jury had seen him "sit there on

the witness stand").  The argument did not employ deceptive or reprehensible means. It was not improper and was in any case harmless.  (*Martinez, supra*, 47 Cal.4th at pp. 958-959)

      6.      Inviting jury to sympathize with Senior

Next defendant argues that the prosecutor improperly invited the jury to sympathize with Senior.  During closing argument the prosecutor discussed the point at which the evidence had come back from Nike showing that the bloody warranty card found at the crime scene was from a Nike youth baseball bat and such a bat had been purchased with cash at the Primm outlet during the time defendant was in the area.  He described giving the news to Senior: "Imagine that you were a 94-year-old gentleman and you receive a phone call describing the exact nature in which your son and his wife met their demise."

Trial counsel objected to the statement as referring to facts not in evidence and as improper argument. The objection was sustained and the trial court instructed the prosecutor to move ahead.  No admonition was requested or given.

The prosecutor then made one further reference to Senior having to testify on his 95th birthday in a case in which his grandson was charged with murdering his son.  The prosecutor then moved ahead with his argument.

On this point, the Attorney General acknowledges the prosecutor may have committed misconduct.  Indeed, it is improper for the prosecutor to encourage the jury to view the crime through the eyes of the victims' family.  (*Vance, supra*, 188 Cal.App.4th at p. 1193.)  But viewing the comments in the context of the whole closing argument we cannot find the error was cause for reversal.

Because this isolated remark did not amount to a due process violation, the proper standard of prejudice is the state law standard.  (*Stansbury, supra*, 4 Cal.4th at p. 1057.) Even if some of the prosecutor's statements must be considered misconduct, any prejudice was at least partially offset by the fact that he also emphasized in closing argument that the jury must not "decide this case based on emotion," including Senior's emotional testimony, but rather the jury's "job is to be neutral, objective, finders of fact."

61

Given the strength of the evidence and the whole of the argument, there is no reasonable likelihood the verdicts would have been different had the prosecutor omitted the references to the impact of the crimes on Senior.

7. "Narcissistic Sociopath"

This claim has been fully discussed, *ante*.

8. Appealing to jury's passions, while disparaging defense counsel

In discussing the testimony of MacMillan, Senior's housemate, the prosecutor commented on what he considered to be an overzealous cross-examination: "I have never seen the treatment of a witness like I did with Hilde MacMillan. It made my blood boil." A defense "improper argument" objection was overruled and the prosecutor continued, "The way he treated her. A woman who did nothing but try her best to simply come in here and tell what she knew."

Defendant claims these statements wrongfully appealed to the passions of the jury and unfairly disparaged defense counsel. It is misconduct for a prosecutor to disparage defense counsel's honesty or integrity or to suggest he or she has fabricated a defense. (*Cash*, *supra*, 28 Cal.4th at p. 732; *People v. Hill* (1998) 17 Cal.4th 800, 832; *People v. Thompson* (1988) 45 Cal.3d 86, 112; *Bruno v. Rushen* (9th Cir. 1983) 721 F.2d 1193, 1194-1195 ["absent specific evidence in the record, no particular defense counsel can be" accused of "underhanded" or "unethical" conduct].)

But not every criticism of defense counsel falls into that category. When such criticism is limited to commenting on a particular defense attorney's conduct at trial, the rule is different. There is no misconduct if a prosecutor's arguments constitute fair response to something defense counsel himself has said or done at trial. (*People v. Pearson* (2013) 56 Cal.4th 393, 431-432.)

Indeed, a prosecutor enjoys "wide latitude in describing the deficiencies in opposing counsel's tactics and factual account." (*People v. Bemore* (2000) 22 Cal.4th 809, 846.) Our state courts have repeatedly rejected misconduct claims when confronted with negative comments about defense counsel's conduct at trial. (See, e.g., *Zambrano*, *supra*, 41 Cal.4th at pp.1154-1155 [calling defense counsel's argument a " 'lawyer's

62

game' "]; *People v. Huggins*, *supra*, 38 Cal.4th at p. 207 [prosecutor argued defense counsel " 'tried to smoke one past us' "]; *People v. Stitely* (2005) 35 Cal.4th 514, 559 [telling jurors to "avoid 'fall[ing]' for [defense] counsel's argument" and to view it as a " 'ridiculous' attempt to allow defendant to 'walk' free" and as a " 'legal smoke screen' "]; *People v. Young* (2005) 34 Cal.4th 1149, 1193 [calling defense counsel's argument " 'idiocy' "]; *People v. Cunningham* (2001) 25 Cal.4th 926, 1002-1003 [prosecutor said defense counsel's " 'job is to put up smoke, red herrings' "]; *People v. Gionis* (1995) 9 Cal.4th 1196, 1215-1216 [saying defense counsel was "arguing out of both sides of his mouth"].) A prosecutor may "use[] colorful language to permissibly criticize counsel's tactical approach." (*People v. Huggins*, *supra*, 38 Cal.4th at p. 207.)

Here the prosecutor's sole accusation was that defense counsel was a bit hard on an elderly witness during cross-examination. There was no name-calling. There was no suggestion that counsel was unethical or tried to hide the truth from the jury. The jury had been present during the cross-examination of MacMillan and could judge for itself whether defense counsel's treatment of her was too harsh.

Moreover, even if they assessed defense counsel's questioning as overzealous, no spillover effect to defendant would be expected. Nor do we think it would have so reduced defense counsel's standing in the jury's eyes as to threaten his ability to present defendant's case. The remarks were not intended to or likely to distract the jury from the evidence itself or the serious issues to be decided. And even if the remarks were regarded as misconduct, they were nonprejudicial in light of the whole argument and the evidence in the case. (*Watson*, *supra*, 46 Cal.2d at p. 836.)

9.      "Narcissistic Sociopath" at end of rebuttal

This claim was rejected, *ante*.

In sum we find that none of the alleged misconduct, individually or considered in combination, rose to the level of a federal constitutional violation; whatever comments bordered on misconduct or crossed the line did not render the trial fundamentally unfair. To the extent there was misconduct under state law, it was harmless. (*People v. Hill*, *supra*, 17 Cal.4th at pp. 844-845; *Watson*, *supra*, 46 Cal.2d at p. 836.)

63

### *Ineffective assistance of counsel for failure to object to demonstrative evidence*

Defendant's next claim is that his attorney provided ineffective assistance of counsel because he failed to move to exclude testimony by the detectives who drove the routes from Las Vegas to Pleasanton to Brea. He claims the evidence was objectionable as an improper experiment because it was not "substantially similar" to the actual events it sought to replicate. The lack of similarity, we are told, is due primarily to the fact that the driving experiment did not take account of the time and energy it would have taken defendant to kill his parents and ransack their home.

Ordinarily, failure to object to the admission of evidence constitutes a waiver of that issue on appeal. (Evid. Code, § 353; *People v. Samuels* (2005) 36 Cal.4th 96, 113.) There was no defense objection (and thus the issue of admissibility has been forfeited), but defendant claims his attorney provided ineffective assistance of counsel by failing to challenge the evidence. (*Strickland v. Washington* (1984) 466 U.S. 668 (*Strickland*).) He raises the issue on appeal, which is appropriate only if there was no conceivable legitimate basis for counsel's failure to object. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267.)

A defendant claiming ineffective assistance of counsel must demonstrate both deficient performance and resulting prejudice. (*Strickland*, *supra*, 466 U.S. at pp. 687, 691-692; *People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) On the first prong he must show that "counsel's representation fell below an objective standard of reasonableness" measured by "prevailing professional norms." (*Strickland*, *supra*, 466 U.S. at p. 688.) Under the second prong, the defendant must show that in the absence of the error it is reasonably probable that a result more favorable to him would have obtained. (*Id.* at p. 694.) "[A] reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Ibid.*)

Experimental evidence may be admitted if (1) it is relevant, (2) its conditions and those existing at the time of the alleged occurrence are shown to be substantially similar, and (3) the evidence will not consume undue time or confuse or mislead the jury. (*People v. Bonin* (1989) 47 Cal.3d 808, 847; *People v. Boyd* (1990) 222 Cal.App.3d 541,

565.) A trial court enjoys wide discretion in deciding whether to admit such evidence, and its decision is reviewed only for abuse of that discretion. (*People v. Boyd*, *supra*, 222 Cal.App.3d at p. 566.)

Defendant claims the prosecution could not have borne its burden of showing the conditions at the time of the test were "substantially similar, although not necessarily absolutely identical conditions" to those at the time leading up to and following the murders. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1326.) By appellate counsel's assessment, there is no conceivable tactical reason for trial counsel's failure to move to exclude such evidence as it directly contradicted the defense theory and was clearly inadmissible. But "a mere failure to object to evidence or argument seldom establishes counsel's incompetence." (*People v. Ghent* (1987) 43 Cal.3d 739, 772.)

As we see it, the primary point of the experiment was to determine whether it was physically possible to drive from Primm, Nevada to Pleasanton, California between the last time defendant's credit card was used in Primm and 8:27 p.m. when a car resembling defendant's was video-recorded entering Castlewood. Secondly it was intended to prove that it was physically possible to drive from Castlewood to Brea between 12:42 a.m., when a car resembling defendant's was recorded leaving Castlewood, and 6:36 a.m., when defendant's cell phone was reactivated in Brea.

Defendant posits that the experiment was also intended to show that someone who had done all that driving could also be alert enough to play "vigorous" bridge in a tournament the next day. In that regard, defendant claims the experiment was faulty because it omitted the murder and the physical exhaustion that would have accompanied the beating and stabbing of two able-bodied people. Secondly, he suggests the drive test performed by the detectives was faulty because they did not play intense competition bridge after completing the drive.

This argument assumes the evidence was admissible only if it replicated every aspect of the murders and ensuing events. The test drive evidence was relevant and therefore admissible if it tended to prove the two legs of the drive could have been completed within the timeframe available to defendant, regardless whether it was also

relevant to showing that defendant would have been alert enough to play in a bridge tournament the next day.

The jury was in no way misled and the evidence was not inflammatory. Had it included a mock murder there may have been all the more reason for objection. (Cf. *People v. Rivera* (2011) 201 Cal.App.4th 353, 360-361, 363-367 [courtroom demonstration of strangulation].) And finally, defendant's argument assumes facts not in evidence, namely the psychological and physical effects of beating one's parents to death and slitting their throats. For all we know such an experience may produce an unusual rush of adrenaline sufficient to sustain one through a few hands of bridge. Besides, it certainly may be doubted how much physical "vigor" is required to compete in a bridge tournament.

As for the argument that the detectives did not play bridge after completing the drive, again, we find it did not materially alter the similarity of the experiment for purposes of its admissibility. The officer who had done the driving did stay up until 8:00 p.m. and reported she did not feel tired until approximately 7:00 p.m. The jury was free to determine for itself whether this was convincing evidence that defendant would have been physically capable of committing the murders within the timeframe derived from his cell phone records. Defendant's argument takes us far beyond the requirement of "substantially similar but not identical" circumstances.

The defects now pointed out by defendant went to the weight to be accorded the evidence, not to its admissibility. "[W]e must assume that the jurors were intelligent people and that they understood and took into account the differences identified . . . on appeal." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1115-1116.) We find no basis upon which the evidence could realistically have been excluded. And because the evidence was properly admissible, defense counsel was not ineffective for failing to attempt to have it excluded. In any event, defendant's own investigator conducted the same experimental drives with the same results: he was able to drive from Primm to Pleasanton in seven hours and 9 minutes and from Pleasanton to Brea in six hours and 48 minutes.

66

*Parole revocation fine*

Defendant claims it was error for the court to impose a parole revocation fine under section 1202.45, since he was sentenced to prison for life without possibility of parole. The Attorney General agrees, as do we. The fine is not applicable to a person sentenced only to a term of life imprisonment without the possibility of parole. (*People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1183.) But such a fine must be imposed where a defendant receives both a sentence of life without possibility of parole and a determinate sentence. (*People v. Brasure* (2008) 42 Cal.4th 1037, 1075.) Since the only determinate terms in this case were for weapon enhancements attached to the two life terms, not for separate offenses, a parole revocation fine was not appropriate. We will therefore order the abstract of judgment modified to strike that fine.

## DISPOSITION

The abstract of judgment is ordered modified to strike the parole revocation fine imposed under section 1202.45. In all other respects the judgment is affirmed.

_____
Richman, J.

We concur:

_____
Kline, P.J.

_____
Haerle, J.